# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1998-DR-01821-SCT

*BOBBY GLEN WILCHER a/k/a BOBBY GLENN WILCHER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 6/23/1994 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | SCOTT COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT M. RYAN |
| | LOUWLYNN WILLIAMS |
| | WILLIAM CLAYTON |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:   MARVIN L. WHITE, JR. |
| |         CHARLENE R. PIERCE |
| |         JO ANNE McLEOD |
| |         JERROLYN M. OWENS |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | APPLICATIONS FOR LEAVE TO SEEK POST-CONVICTION RELIEF DENIED - 10/02/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1.     On March 11, 1982, Bobby Glen Wilcher (Wilcher) was indicted in the Circuit Court

of Scott County, Mississippi, for the capital murders of Velma Odell Noblin (Noblin) and

Katie Belle Moore (Moore). The indictment charged that Wilcher murdered these two women while attempting to rob Noblin and while he was engaged in the kidnaping of both women. Although these murders arose from a single incident, Wilcher was tried separately for these murders in Scott County in 1982. Circuit Court Judge Marcus D. Gordon was the trial judge in both cases. Wilcher was found guilty and sentenced to death pursuant to jury verdict in both cases in 1982.

¶2.     This Court affirmed both capital murder convictions and sentences of death. *Wilcher v. State*, 448 So.2d 927 (Miss. 1984)[1] and *Wilcher v. State*, 455 So.2d 727 (Miss. 1984)[2]. The U.S. Supreme Court denied certiorari on October 1, 1984. *Wilcher v. Mississippi*, 469 U.S. 873, 105 S.Ct. 231, 83 L.Ed.2d 160 (1984). Wilcher's subsequent motions for post-conviction relief in these consolidated cases were denied on initial review. *Wilcher v. State*, 479 So.2d 710 (Miss. 1985). The U.S. Supreme Court denied certiorari on March 31, 1986. *Wilcher v. Mississippi*, 475 U.S. 1078, 106 S.Ct. 1501, 89 L.Ed.2d 901 (1986).

¶3.     Wilcher then filed two separate petitions for writ of habeas corpus in the U.S. District Court for the Southern District of Mississippi. *Wilcher v. Cabana*, No. J86-0313 and *Wilcher v. Cabana*, No. J86-0311 (S.D. Miss.). The district court consolidated the petitions on November 26, 1986, and denied habeas relief on June 19, 1990. Wilcher filed a notice of

---

[1]   Direct appeal from capital murder conviction for the murder of Noblin. Trial held in Scott County.

[2]  Direct appeal from capital murder conviction for the murder of Moore. Trial held in Harrison County.

appeal and an application for certificate of probable cause, and the certificate was granted on September 24, 1990.

¶4.    The U.S. Court of Appeals for the Fifth Circuit held that the sentences should be vacated unless this Court reviewed the sentences under *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), because the use of the undefined "especially heinous" aggravating factor during the sentencing phases.  The Fifth Circuit denied relief on all other claims raised by Wilcher.  *Wilcher v. Hargett*, 978 F.2d 872 (5th Cir.), *rehearing en banc denied*, 981 F.2d 1254 (5th Cir. 1992).  Wilcher filed a petition for writ of certiorari with the U.S. Supreme Court challenging the Fifth Circuit's affirmance of the district court and the petition was denied on October 4, 1993.  *Wilcher v. Hargett*, 510 U.S. 829, 114 S.Ct. 96, 126 L.Ed.2d 63 (1993).

¶5.    This Court vacated both of Wilcher's death sentences and remanded for new sentencing proceedings. *Wilcher v. State*, 635 So.2d 789 (Miss. 1993).  Wilcher was sentenced to death on June 23, 1994, in Rankin County, after a change of venue, for the capital murder of Noblin.  Wilcher was also sentenced to death on July 21, 1994, in Harrison County, after a change of venue, for the capital murder of Moore.  Circuit Court Judge Gordon presided over both sentencing trials.  Both sentences were affirmed by this Court on appeal.  *Wilcher v. State*, 697 So.2d 1087 (Miss. 1997) (*Wilcher I*)[3]; and *Wilcher v. State*, 697 So.2d 1123 (Miss. 1997) (*Wilcher II*)[4], respectively.  The U.S. Supreme Court denied certiorari on January 12,

---

[3]  Direct appeal after being re-sentenced to death for the murder of Noblin in Rankin County.

[4] Direct appeal after being re-sentenced to death for the murder of Moore in Harrison County.

1998. *Wilcher v. Mississippi*, 522 U.S. 1053, 118 S.Ct. 705, 139 L.Ed.2d 647, and rehearing, 522 U.S. 1154, 118 S.Ct. 1181, 140 L.Ed.2d 188 (1998).

¶6. Pursuant to the Mississippi Uniform Post-Conviction Collateral Relief Act, Miss. Code Ann. §§ 99-39-1 to -29 (Rev. 2000 & Supp. 2003), Wilcher now files his post-conviction application for leave of this Court to proceed in the trial court regarding his capital murder conviction and death sentence for the murder of Moore. We deny the application.

## FACTS

¶7. This Court's opinion on Wilcher's appeal contains the following facts:

This capital murder case is presently before this Court on direct appeal from a 1994 resentencing trial that resulted in Bobby Glenn Wilcher's second death sentence for the 1982 murder and robbery of Katie Belle Moore, age forty-five. The case arises out of the gruesome double murder and robbery of Velma Odell Noblin and Katie Belle Moore. The evidence reflects that Bobby Glenn Wilcher, age nineteen, met his two female victims at a Scott County bar on the night of March 5, 1982. When the bar closed at midnight, Wilcher persuaded the women to take him home. Under this pretext, he directed the women down a deserted service road in the Bienville National Forest--where he robbed and brutally murdered the women by stabbing them a total of forty-six times.

Thereafter, Wilcher was stopped for speeding by the Forest Police Department between 1:00 and 2:00 a.m. He was alone and was driving victim Noblin's car. The victims' purses and one victim's brassiere were on the back seat. Wilcher was covered in blood; he had a bloody knife in his back pocket that had flesh on the blade. Wilcher explained his condition by telling the policeman that he had cut his thumb while skinning a possum. The officer followed Wilcher to the hospital, where Wilcher's wound was cleaned and covered with a band-aid. Another officer was called to the hospital to observe Wilcher, the knife, the car, the purses, and the brassiere.

The officers left the hospital on an emergency call. Wilcher went home. The next morning, he abandoned Noblin's car at an apartment complex. Wilcher also threw the victims' purses and some of the victims' clothing in a ditch. He was arrested later that day. The victims' jewelry was subsequently found in Wilcher's bedroom.

4

*Wilcher II*, 697 So.2d at 1126.

## ISSUES

A.     WHETHER WILCHER'S CONSTITUTIONAL RIGHTS TO CONFRONT A KEY WITNESS AND HIS RIGHT TO A FAIR AND IMPARTIAL HEARING AND DUE PROCESS UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AND UNDER THE MISSISSIPPI CONSTITUTION WERE VIOLATED BY THE TRIAL COURT'S REFUSAL TO ALLOW CROSS-EXAMINATION OF SHERIFF WARREN ON HIS CONVICTION FOR EXTORTION.

B.     WHETHER WILCHER WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL IN THE RESENTENCING TRIAL IN VIOLATION OF HIS RIGHT TO COMPETENT COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE CONSTITUTION AND LAWS OF THE STATE OF MISSISSIPPI, AND HIS RIGHT TO HAVE EVIDENCE PRESENTED TO THE JURY UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS.

C.     WHETHER THE STATE'S INVOCATION OF HIGHER BIBLICAL LAW VIOLATES WILCHER'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS, AND UNDER ARTICLE 3, SECTION 14 OF THE MISSISSIPPI CONSTITUTION AND DEFENSE COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE THIS ISSUE AT TRIAL.

D.     WHETHER THE TRIAL COURT IMPROPERLY EXCUSED POTENTIAL JURORS IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS AND DEFENSE COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE THIS AT TRIAL AND ON DIRECT APPEAL.

E.     WHETHER WILCHER WAS DEPRIVED OF HIS RIGHT TO A FAIR AND IMPARTIAL JURY UNDER THE SIXTH AND FOURTEENTH AMENDMENTS, AND UNDER ARTICLE 3, SECTIONS 14 AND 26 OF THE MISSISSIPPI CONSTITUTION BY JURORS' FAILURE TO REVEAL AUTOMATIC DEATH PENALTY TENDENCIES; DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE STATE'S UNCONSTITUTIONAL ARGUMENT.

F. **WHETHER WILCHER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO BE TRIED BY A FAIR AND IMPARTIAL JURY WERE VIOLATED BY THE JURY'S RELIANCE ON MATTERS NOT PRESENTED IN EVIDENCE.**

G. **WHETHER PROSECUTION'S USE OF SENTENCING INSTRUCTIONS S-1, S-2, AND S-4 WAS UNCONSTITUTIONAL AND DEFENSE COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE THIS AT TRIAL AND ON DIRECT APPEAL.**

H. **WHETHER WILCHER'S FIFTH, EIGHTH AND/OR FOURTEENTH AMENDMENT RIGHTS HAVE BEEN VIOLATED BY THE LENGTH OF TIME ON MISSISSIPPI'S DEATH ROW AND THE MANY EXECUTION DATES THAT HAVE BEEN SET.**

I. **WHETHER THE ACCUMULATION OF ERROR IN THIS CASE REQUIRES THAT THE DEATH SENTENCE BE SET ASIDE.**

## ANALYSIS

A. **WHETHER WILCHER'S CONSTITUTIONAL RIGHTS TO CONFRONT A KEY WITNESS AND HIS RIGHT TO A FAIR AND IMPARTIAL HEARING AND DUE PROCESS UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AND UNDER THE MISSISSIPPI CONSTITUTION WERE VIOLATED BY THE TRIAL COURT'S REFUSAL TO ALLOW CROSS-EXAMINATION OF SHERIFF WARREN ON HIS CONVICTION FOR EXTORTION.**

¶8.     Sheriff Glenn Warren took Wilcher's statements during the investigation of these crimes and testified in 1982 during the guilt phase. In a statement to Sheriff Warren, as Warren testified, Wilcher confessed to the murders of Moore and Noblin and to the robbery of Noblin. In 1989, Sheriff Warren was convicted of extortion in violation of the federal Hobbs Act. Shortly after this conviction and before Wilcher's resentencing trial, Sheriff Warren died. At Wilcher's resentencing in 1994, the trial judge allowed Sheriff Warren's 1982 testimony to be read into evidence, but he would not allow the defense to introduce evidence of the sheriff's 1989 extortion conviction for the purpose of impeachment. The trial court's

6

decision was based on Sheriff Warren's guilty plea being entered in 1989, seven years after giving testimony against Wilcher in 1982. Wilcher asserts that the trial court violated his rights under the Sixth and Fourteenth Amendments of the U.S. Constitution and Article 3, Section 26, of the Mississippi Constitution and abused its discretion by denying him the ability to introduce Sheriff Warren's 1989 conviction for impeachment purposes.

¶9. The issue of whether the trial court abused its discretion in denying Wilcher's attempt to introduce Sheriff Warren's 1989 conviction into evidence was fully addressed by this Court on Wilcher's direct appeal. *Wilcher II*, 697 So.2d at 1131-32. In its discussion, this Court recognized that not allowing the sheriff's conviction into evidence was within the trial judge's discretion. M.R.E. 609(a)(1). In reviewing the trial judge's decision for an abuse of discretion, this Court stated:

> The trial judge stated that the conviction had no probative value because it occurred seven years after the sheriff's original testimony. In analyzing the probative value of the 1989 conviction, it is important to consider the unique way this evidence was presented to the jury. The trial judge properly considered the fact that the testimony given at the 1994 trial was given by someone who had not been convicted of a crime at the time he originally made the statements at issue. This would tend to decrease the probative value of the sheriff's 1989 extortion conviction. Furthermore, Wilcher has not demonstrated anything about the sheriff's life that would have influenced the investigation of the case at hand. Therefore, the trial judge did not abuse his discretion in excluding the conviction. *See also* ***Turner v. State***, 573 So.2d at 1340. Wilcher's argument to the contrary is without merit.

*Wilcher II*, 697 So.2d at 1131-32.

¶10. The sheriff's prior testimony was admissible under M.R.E. 804. At the time Sheriff Warren gave his original testimony in 1982, Wilcher was present with counsel and thus had the ability to confront Sheriff Warren. "The doctrine of *res judicata* shall apply to all issues, both

7

factual and legal, decided at trial and on direct appeal." Miss. Code Ann. § 99-39-21(3). This issue is procedurally barred. Without waiving the procedural bar, the issue is also without merit.

### Whether Circuit Court Judge Marcus D. Gordon should have recused himself.

¶11. Wilcher attempts a new angle of attack to convince this Court that the trial court abused its discretion by not permitting Sheriff Warren's 1989 conviction to be introduced for impeachment purposes. Wilcher asserts that Judge Gordon did not possess impartial judgment and should have recused himself from the trial. In support of his assertion, Wilcher alleges that Judge Gordon possessed personal knowledge about disputed facts.

¶12. Wilcher also argues that other aspects of the trial tend to show that Judge Gordon was biased in this case, such as ex parte contact, judicial comments, and voir dire that resulted in a tainted jury. This Court finds that these issues, are procedurally barred because they were capable of being raised at trial or on direct appeal. Miss. Code Ann. § 99-39-21(1). Even if they were not procedurally barred, Wilcher is attempting to convince this Court to reevaluate the underlying claim that he should have been permitted to introduce Sheriff Warren's 1989 conviction for impeachment purposes. As stated before, this Court already discussed this issue on the merits, found no abuse of discretion by the trial court, and the issue is therefore barred. Miss. Code Ann. § 99-39-21(3). However, without waiving the procedural bar, a discussion on the merits follows.

¶13. Judge Gordon served as Circuit Judge of the Eighth Circuit Court Judicial District and resigned to return to the practice of law in August of 1987. Wilcher asserts that during the

8

period of time between Judge Gordon's resignation and his reelection to the bench, Judge Gordon represented Sheriff Warren on the federal Hobbs Act charges. Wilcher offers Sheriff Warren's Memorandum of Understanding dated April 1, 1988, and the sheriff's Entry of Guilty Plea dated April 8, 1988, both of which have Judge Gordon listed as one of Sheriff Warren's attorneys. Wilcher's Exhibits 1 and 2. Judge Gordon's signature does not appear anywhere on either of the two federal documents presented by Wilcher.

¶14.   On Wilcher's direct appeal, this Court stated that Wilcher had not demonstrated anything about the sheriff's life that would have influenced the investigation of Wilcher's case. *Wilcher II*, 697 So.2d at 1132. In an attempt to show that the sheriff was corrupt at the time Wilcher's crimes were being investigated and that the trial judge knew it, Wilcher offers this Court a character letter written by Judge Gordon to the sheriff's sentencing court on the sheriff's behalf. The letter begins, "With deep regret, I now realize that Glenn Warren was involved in corruption in Scott County, Mississippi, during the time that he served Scott County as its Sheriff. However, I feel there are a number of facts that I possess particular knowledge thereof, regarding Glenn and his involvement." Wilcher relies on the letter to show that the trial judge had personal knowledge of disputed facts.

¶15.   Wilcher directs this Court's attention to the Code of Judicial Ethics, Canon 3(C)(1)(a), in effect during Wilcher's resentencing trial:

    C.    Disqualification

    (1)   A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

> (a) he has a personal bias or prejudice concerning a party, or *personal knowledge of disputed evidentiary facts concerning the proceedings*;

(emphasis added).

¶16. We find that the statements from the character letter are not conclusive of Wilcher's allegation. Judge Gordon's character letter also states:

> I also served with [Sheriff] Glenn [Warren] for one year while District Attorney, and served thereafter for nine years as his Circuit Judge, and I had the opportunity on many occasions to observe his efforts toward law enforcement. In my opinion, he was an outstanding sheriff. I, on many occasions, had the opportunity to observe where he would give answers from the witness chair that were harmful to his case, but he was very candid and forthright with his testimony and gave true testimony, although it was hurting his case. In addition, I heard many cases that resulted in a conviction of a guilty defendant that was a result of good law enforcement and investigation on the part of Glenn.

¶17. Wilcher attempts to convince this Court that Judge Gordon was biased and should have recused himself because he had personal knowledge surrounding Sheriff Warren's 1989 conviction. Wilcher contends that the very fact that Judge Gordon did not let the conviction into evidence tends to prove that Judge Gordon was biased. This Court finds that Wilcher has not shown that Judge Gordon was biased.

¶18. Wilcher also argues that it would be an abuse of discretion for the trial judge to exclude the sheriff's conviction solely on the basis that it occurred seven years after Sheriff Warren's 1982 testimony when the judge had personal knowledge that the sheriff's corruption occurred much closer to the sheriff's 1982 testimony because the judge represented the sheriff.

¶19. In response, the State offers a sworn affidavit from Judge Gordon which states:

> That heretofore the undersigned served as Circuit Judge of the Eighth Circuit Court Judicial District and resigned to return to the practice of law in August, 1987, and that while practicing law, Sheriff Glenn Warren was indicted on a Federal felony charge, and that he employed the Hon. Alvin Binder, Jackson,

Mississippi, as his attorney to represent him in the criminal proceedings. Some great considerable time thereafter, Glenn Warren contacted the undersigned about representation, but I advised Warren that he had a competent and capable attorney and I could be of very little benefit to him. However, I did interview one or possibly two witnesses, but took no further action in representing the Sheriff. I made no Court appearances with him, filed no pleadings for him, was not involved in the plea bargaining that was handled by Alvin Binder and was not present at the time the Sheriff was sentenced. The only involvement I had was one conversation with one, possibly two witnesses. I did not consider myself an attorney representing Glenn Warren. I made no charge, nor did I receive any compensation in any form for what little service I rendered.

¶20.    Judge Gordon's involvement in Sheriff Warren's case was very limited and, as Judge Gordon stated, he did not consider himself as attorney representing Sheriff Warren. However, this test is not what Judge Gordon considered. "A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality." *Jenkins v. State*, 570 So.2d 1191, 1192 (Miss. 1990) (quoting *Rutland v. Pridgen*, 493 So.2d 952, 954 (Miss. 1986).

¶21.    Wilcher's attempts to show that Judge Gordon was biased  are not convincing, but his argument that Judge Gordon should have recused himself may have merit.  However, the evidence surrounding Wilcher's recusal claim was capable of being discovered and raised at both the trial level and on direct appeal.  Therefore, the issue is barred.  Miss. Code Ann. § 99-39-21(1) & (2).

¶22.    Wilcher cannot overcome the bar by showing actual prejudice because, despite his contention, the sheriff's testimony was not the only link to robbery as an aggravating circumstance to the capital murder charge. Throughout Wilcher's post-conviction application, he complains that the sheriff's testimony regarding Wilcher's confession is the only evidence that tends to show the aggravating circumstance of robbery.  This simply is not so.

11

¶23. The State correctly points out that, other than Wilcher's confession entered into evidence through Sheriff Warren's testimony, the State introduced evidence of the robbery through Albert Harkey's testimony. Harkey was a constable at the time of the murders, and he testified that he and Deputy Otis Kelly recovered a necklace, a watch and two rings from Wilcher's bedroom. Bill Noblin, Odell Noblin's husband, identified the jewelry items as those belonging to his wife, and he testified that she had been wearing them when he last saw her on the night of the murders. Nell Boykin, Odell Noblin's daughter, also identified the jewelry items as those belonging to Odell Noblin. Additionally, Sid Salter, a journalist, testified that Wilcher confessed to taking Odell Noblin's car after he had murdered her. Therefore, even if Sheriff Warren's 1989 conviction had been introduced to impeach his testimony, there was still enough other evidence admitted to support the finding of robbery as an aggravating factor.

¶24. The issue concerning Judge Gordon's recusal is procedurally barred in Wilcher's post-conviction application. Miss. Code Ann. § 99-39-21(1). Wilcher cannot show prejudice to overcome that bar. Additionally, Wilcher argues all of these points to again try and convince this Court that Sheriff Warren's 1989 conviction should have been admitted into evidence. This Court addressed this issue on direct appeal, and it is procedurally barred also. Miss. Code Ann. § 99-39-21(3).

**Intervening case**

¶25. Wilcher contends that there has been an intervening decision by this Court rendered between the time of his direct appeal and his post-conviction application, which "would have actually adversely affected the outcome of his conviction or sentence." Miss. Code Ann. § 99-39-27(9). The case on which Wilcher relies is *Young v. State*, 731 So.2d 1145 (Miss. 1999).

¶26.    In *Young*, Ross was a witness for the State.  On cross-examination, the defense asked Ross if he had ever been convicted of a felony, to which Ross replied, "No, sir."  *Id*. at 1149. The trial judge declared that under Miss. R. Evid. 609 and 403, the evidence of Ross's prior conviction for burglary was inadmissible.  *Id*.  This Court found that the trial judge abused his discretion.  *Id*. at 1151.  Citing the dissenting opinion of Sullivan, P.J., in *Wilcher II*, 697 So.2d at 1143, this Court determined that, since Ross was not a party, any prejudice to him was irrelevant and to deny Young the right to fully explore this aspect of Ross's credibility is to deny Young the right to fully confront the witness against him.  *Young*, 731 So.2d at 1151. Wilcher asserts that M.R.E. 609 should not have prevented him from presenting evidence of Sheriff Warren's conviction since the sheriff was a non-party witness.

¶27.    Again, on Wilcher's direct appeal after being resentenced to death for the murder of Moore, this Court stated:

> The trial judge stated that the conviction had no probative value because it occurred seven years after the sheriff's original testimony.  *In analyzing the probative value of the 1989 conviction, it is important to consider the unique way this evidence was presented to the jury.*  The trial judge properly considered the fact that the testimony given at the 1994 trial was given by someone who had not been convicted of a crime at the time he originally made the statements at issue.  This would tend to decrease the probative value of the sheriff's 1989 extortion conviction.  Furthermore, Wilcher has not demonstrated anything about the sheriff's life that would have influenced the investigation of the case at hand.  Therefore, the trial judge did not abuse his discretion in excluding the conviction.

*Wilcher II*, 697 So.2d at 1132 (emphasis added).

¶28.    *Young* is distinguishable from the instant case.  In the case sub judice, Sheriff Warren was convicted for extortion seven years after his testimony was given in 1982.  When his testimony was given in 1982, Sheriff Warren did not have a prior felony conviction.  Further,

13

the sheriff was not present to testify against Wilcher in 1994. In *Young*, Ross was present to testify, and he had a prior felony conviction for burglary. Further, when Ross was asked if he had ever been convicted of a felony, Ross replied "No, sir." *Young*, 731 So.2d at 1149.

¶29. We find that *Young* is distinguishable from this Court's reasoning in Wilcher's direct appeal and, therefore, not an intervening case that would warrant a reversal of Wilcher's sentence of death.

**B. WHETHER WILCHER WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL IN THE RESENTENCING TRIAL IN VIOLATION OF HIS RIGHT TO COMPETENT COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE CONSTITUTION AND LAWS OF THE STATE OF MISSISSIPPI, AND HIS RIGHT TO HAVE EVIDENCE PRESENTED TO THE JURY UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS.**

¶30. We have noted:

Post-conviction proceedings are for the purpose of bringing to the trial court's attention [to] facts not known at the time of judgment. *Smith v. State*, 477 So.2d 191 (Miss.1985). The Post-conviction Collateral Relief Act provides a procedure limited in nature to review those matters which, in practical reality, could not or should not have been raised at trial or on direct appeal. *Turner v. State*, 590 So.2d 871 (Miss.1991); *Cabello v. State*, 524 So.2d 313, 323 (Miss.1988).

Procedural bars of waiver, different theories, and res judicata and exception thereto as defined in post-conviction relief statute are applicable in death penalty post-conviction relief application. *Lockett v. State*, 614 So.2d 888 (Miss.1992), cert. denied, 510 U.S. 1040, 114 S.Ct. 681, 126 L.Ed.2d 649 (1994). We have repeatedly held that a defendant is procedurally barred by waiver from making a challenge to a capital sentencing scheme as a whole in a petition for post-conviction relief where the issue was capable of determination at trial and/or on direct appeal but was not raised, and defendant failed to show cause or actual prejudice for not raising the issue on direct appeal. *Lockett v. State*, 614 So.2d 898 (Miss.1992), cert. denied, 510 U.S. 1040, 114 S.Ct. 681, 126 L.Ed.2d 649 (1994); *Smith v. State*, 477 So.2d 191 (Miss.1985). Post-conviction relief is not granted upon facts and issues which could or

14

should have been litigated at trial and on appeal. 'The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal.' Miss.Code Ann. § 99-39- 21(3) (Supp.1994). We must caution that other issues which were either presented through direct appeal or could have been presented on direct appeal or at trial are procedurally barred and cannot be relitigated under the guise of poor representation by counsel.

*Foster v. State*, 687 So.2d 1124, 1129 (Miss. 1996).  Further we have stated:

The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The test is two pronged: The defendant must demonstrate that his counsel's performance was deficient, and that the deficiency prejudiced the defense of the case. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Washington v. State*, 620 So.2d 966 (Miss.1993). 'This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.' *Stringer v. State*, 454 So.2d 468, 477 (Miss.1984), citing *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. at 2064. 'In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.' *Stringer* at 477, citing *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065; *State v. Tokman*, 564 So.2d 1339, 1343 (Miss.1990).

Judicial scrutiny of counsel's performance must be highly deferential. (citation omitted) ... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' *Stringer* at 477; *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. In short, defense counsel is presumed competent. *Johnson v. State*, 476 So.2d 1195, 1204 (Miss.1985); *Washington v. State*, 620 So.2d 966 (Miss.1993).

Then, to determine the second prong of prejudice to the defense, the standard is 'a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different.' ***Mohr v. State***, 584 So.2d 426, 430 (Miss.1991). This means a 'probability sufficient to undermine the confidence in the outcome.' ***Id***. The question here is whether there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death. ***Strickland***, 466 U.S. at 695, 104 S.Ct. at 2068.

There is no constitutional right then to errorless counsel. ***Cabello v. State***, 524 So.2d 313, 315 (Miss.1988); ***Mohr v. State***, 584 So.2d 426, 430 (Miss.1991) (right to effective counsel does not entitle defendant to have an attorney who makes no mistakes at trial; defendant just has right to have competent counsel). If the post-conviction application fails on either of the ***Strickland*** prongs, the proceedings end. ***Neal v. State***, 525 So.2d 1279, 1281 (Miss.1987); ***Mohr v. State***, 584 So.2d 426 (Miss.1991).

***Foster***, 687 So.2d at 1129-30.

### 1. Whether trial counsel were ineffective for failing to protect Wilcher's Fifth and Sixth Amendment rights.

¶31. Wilcher contends that his trial counsel allowed his Fifth and Sixth Amendment rights to be violated when they allowed him to be interviewed by the State's psychological and psychiatric experts outside the presence of counsel. He contends that the interview was a "critical stage" of the proceedings against him and that his counsel should have been present. The information adduced at the interview was used in rebuttal of Wilcher's mitigating evidence and showed that he was not under the influence of extreme mental or emotional disturbance at the time the murders were committed. Wilcher contends that his counsels' absence prejudiced him because they were not there to protect his Fifth Amendment right against self-incrimination and his Sixth and Fourteenth Amendment rights to counsel and due process at crucial stages of proceedings against him.

16

¶32.   As the State correctly points out, Wilcher raised the underlying issue at trial and on direct appeal when asserting that the doctors' testimony resulted from an examination that went beyond the scope of the trial court's order.  In its opinion, this Court stated:

> The defense attorneys reviewed the order granting the State's motion for a psychiatric evaluation, which instructed the doctors to perform an examination to determine Wilcher's ability to stand trial and assist his attorneys in his own defense, as well as Wilcher's ability to know the difference between right and wrong and understand the nature of his actions at the time of the offense. The defense attorneys did not object to this type examination, and, therefore, they did not attend the doctors' interview of Wilcher.

> * * *

> Furthermore, the doctors told Wilcher that anything he said could be used against him during the sentencing phase. The doctors offered to allow Wilcher to call his attorneys. Thus, to the extent that Wilcher answered the doctors' questions, he did so with full knowledge of his rights.

> The United States Supreme Court has "explicitly declined to hold that a defendant who has obtained counsel cannot himself waive his right to counsel." *Michigan v. Harvey*, 494 U.S. 344, 352, 110 S.Ct. 1176, 1181, 108 L.Ed.2d 293 (1990) (citing *Estelle v. Smith*, 451 U.S. 454, 471-472, n. 16, 101 S.Ct. 1866, 1877 n. 16, 68 L.Ed.2d 359 (1981)). "To hold that a defendant is inherently incapable of relinquishing his right to counsel once it is invoked would be 'to imprison a man in his privileges and call it the Constitution.' This we decline to do." *Michigan v. Harvey*, 494 U.S. at 353, 110 S.Ct. at 1182 (quoting *Adams v. United States ex re. McCann*, 317 U.S. 269, 280, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)).

> Thus, defense counsel was aware of the psychological examination and prepared Wilcher for the interview. The doctors warned Wilcher of his rights, and Wilcher exercised those rights by refusing to answer some of the doctors' questions during the examination. The trial judge limited Dr. Stanley's testimony to that evidence adduced in compliance with the court order and at trial. For these reasons, Wilcher's argument that Dr. Stanley's rebuttal testimony was based on evidence obtained in violation of the Sixth Amendment fails.

*Wilcher II*, 697 So.2d at 1130-31.

17

¶33. The State properly argues that since the underlying substantive claim used to support the claim of ineffective assistance of counsel was found to be without merit by this Court, Wilcher cannot show that his counsels' performance was deficient and cannot show actual prejudice. Wilcher's claim does not pass the *Strickland* test. Further, this issue is procedurally barred. Miss. Code Ann. § 99-39-21(3). "We must caution that other issues which were either presented through direct appeal or could have been presented on direct appeal or at trial are procedurally barred and cannot be relitigated under the guise of poor representation by counsel." *Foster v. State*, 687 So.2d 1124, 1129 (Miss. 1996).

> **2. Whether Wilcher's counsel were ineffective for failing to introduce rebuttal evidence regarding the State's experts.**

¶34. The first part of this argument, that Wilcher's trial attorneys were ineffective for failing to cross-examine Dr. Charles Stanley, is without merit. As just discussed in the previous claim of ineffective assistance by counsel, the State called Dr. Stanley to rebut Wilcher's mitigating evidence. Dr. Stanley opined that Wilcher was not under the influence of any kind of extreme mental or emotional disturbance at the time of the murders.

¶35. Before Dr. Stanley took the stand to offer rebuttal testimony to Wilcher's mitigating evidence, Wilcher's counsel objected asserting a violation of *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). The trial court determined that Wilcher had waived his rights under *Estelle* and permitted Dr. Stanley to testify. Upon the conclusion of the State's direct examination of Dr. Stanley, the trial court asked if the defendant had any surrebuttal testimony. Wilcher's counsel replied: "If the court pleases, Your Honor, in order to preserve

objections previously stated to the Court regarding the prior testimony, we would not offer any surrebuttal."

¶36.     Wilcher avers that his attorneys were ineffective for failing to cross-examine Dr. Stanley because cross-examination would not have waived the *Estelle* objection. Wilcher asserts that his trial counsel should have delved into the prior cases in which Dr. Stanley and Dr. Donald Guild examined defendants and then testified against them in death penalty cases. Wilcher provides this Court with such a list of cases.

¶37.     Even assuming that Wilcher is correct that the objection would not have been waived by cross-examining Dr. Stanley, eliciting further testimony about the doctor's past trial experience would have run the risk of bolstering the doctor's credibility. The State asserts that Dr. Stanley has testified hundreds of times in criminal and civil cases for both the State and the defense and that Wilcher fails to point that out. There is a presumption that counsel's conduct is reasonable and professional and that decisions made are strategic. *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984).

¶38.     The record indicates that Wilcher's attorneys had already obtained favorable testimony from the three doctors called to testify on Wilcher's behalf:  Dr.  Doyle Smith, a physician specializing in addiction medicine; Dr. Patrick McLain, a physician specializing in the treatment of addiction medicine; and Dr. Johnson, a psychologist. Dr. Stanley's testimony was offered by the State as a rebuttal witness.  This Court finds that any failing to cross-examine the State's doctor is not deficient on the part of Wilcher's attorneys as such could possibly have bolstered Dr. Stanley's testimony and given the State more ammunition.

¶39. Next, Wilcher faults his attorneys for failing to offer rebuttal testimony to Dr. Stanley's testimony. Wilcher offers a 107-page affidavit including the attachments from Dr. Mark Cunningham, a forensic psychologist, who presents what is purported to be an extensive rebuttal of Dr. Stanley's testimony. What Wilcher fails to recognize that Dr. Stanley's testimony was rebuttal testimony and anything offered against Dr. Stanley's testimony would be surrebuttal. On Wilcher's direct appeal, this Court recognized that "Dr. Stanley's testimony was used to rebut Wilcher's presentation of mitigating evidence tending to show that Wilcher was extremely emotionally disturbed at the time of the murders." *Wilcher II*, 697 So.2d at 1130. As stated before, Wilcher had just introduced testimony of three doctors as mitigating evidence, Dr. Stanley was offered by the State in rebuttal. We find that surrebuttal is not an entitlement. Surrebuttal is discretionary by the trial judge. *Moody v. State*, 841 So.2d 1067, 1090 (Miss. 2003).

¶40. Again, there is a presumption that counsel's conduct is reasonable and professional and that decisions made are strategic. *Murray*, 736 F.2d at 282. Wilcher has not overcome that presumption. However, even if it is assumed, for the sake of argument, that Wilcher's attorneys were deficient for failing to cross-examine Dr. Stanley or offer testimony in surrebuttal, Wilcher cannot show that his sentence would have been different; therefore, he cannot overcome the second prong of *Strickland*.

**3. Whether Wilcher's counsel failed to introduce rebuttal evidence regarding Wilcher's interview with a journalist.**

¶41. Sid Salter, a journalist, conducted two interviews with Wilcher. The first was in October of 1985, and the second was in March of 1988. Wilcher asserts that he requested the

second interview in order to facilitate a "death wish." Wilcher contends that he was "suicidal" during the 1988 interview, and he now claims that his defense attorneys were ineffective in handling various aspects of the interview evidence presented at trial.

**Favorable portions of the 1985 interview were not offered into evidence.**

¶42. Wilcher contends that certain statements made in the 1985 interview and the 1988 interview conflict in many ways and that his attorneys should have offered statements from the 1985 interview in mitigation of the damning statements from the 1988 interview entered into evidence. Again, Wilcher asserts that the jury would have seen his state of mind during the 1988 interview and given his statements less weight.

¶43. Wilcher asserts that the statements from the 1985 interview would have been favorable due to his reference to his acceptance of Christ and his remorse for the crimes. The State contends that those statements regarding Wilcher's religious conversion, as they are now offered by Wilcher, are taken out of context. Further, the State argues that those statements, when put into proper context, would have informed the jury that Wilcher had previously been sentenced to death. Wilcher's attorneys had filed a motion in limine to exclude information regarding Wilcher's prior death sentence. That motion was sustained. The State did not introduce the 1985 interview into evidence. If the defense had introduced it, the door would have been opened through which the State could have introduced yet another of Wilcher's confessions.

¶44. Second, the State argues that the remorseful statements made by Wilcher do not show sorrow for having committed the murders but, instead, show sorrow for what Wilcher himself

21

had lost as a result of his actions. The statements from the 1985 interview that Wilcher contends should have been proffered by his attorneys to show remorse are, in part, as follows:

Q: Was whatever satisfaction you got worth losing your life over?
A: I didn't get any satisfaction. I wouldn't have got any satisfaction if I had gotten away with it.
Q: What did you get?
A: It ain't what I got. It's what I lost.
Q: What did you lose?
A: I lost a wife, child, family, friends, relatives. You name it. I lost my freedom, my rights, my dignity, my pride. Ain't but one thing I gained out of the whole ordeal - that's God.

This Court finds that the decision not to introduce statements from Wilcher's 1985 interview was strategic.

¶45. Even assuming that Wilcher is correct in his assumption that his attorneys were deficient for not introducing the statements to show a difference in his state of mind during the 1988 interview, it certainly cannot be shown how the outcome of the proceedings would have been different had the 1985 statements been presented to the jury. Wilcher's argument does not pass the *Strickland* test.

**Favorable portions of the 1988 interview were not offered into evidence.**

¶46. Over the objections of defense counsel, portions of the 1988 interview amounting to a confession were introduced into evidence by the prosecution. Remarks regarding Wilcher having killed because "it felt good" were introduced. Wilcher now contends that his attorneys should have introduced portions of the interview where he told Salter that he wanted to drop his appeal and that he was ready to die because he was tired of putting people through misery and sleepless nights. Wilcher contends that this was mitigating evidence that would have shown to the jury that he was suicidal and not in his right mind when the statements were made.

22

It cannot be said that informing the jury of his death wish and desire to forgo the appellate process would have the effect on the jury that Wilcher now contends. In fact, such statements could have been damning in and of themselves. A jury charged with deciding whether a defendant should be put to death may find the task easier knowing that the defendant wants to die. Additionally, such statements may have alluded to the fact that Wilcher had previously been sentenced to death because those statements were made from death row.

¶47. As stated previously, there is a strong presumption that counsel's conduct is reasonable and professional and that decisions made are strategic. *Murray*, 736 F.2d at 282. Wilcher's argument does not overcome that presumption and does not pass the *Strickland* test.

**Wilcher's counsel failed to present evidence which would have shown Wilcher's suicidal ideation and severe depression.**

¶48. The issue presented here by Wilcher is very similar to that raised above. During the 1988 interview, Wilcher made statements reflecting his wish to drop the appeal and be executed.

| | |
|---|---|
| Q. [Sid Salter] | Do you know that by dropping your appeals that you might be hastening your execution? |
| A. [Wilcher] | Yes, sir. That's my plan. |
| Q. | In other words, you want to be executed as soon as possible. |
| A. | Yes, sir. |

\* \* \* \* \*

| | |
|---|---|
| Q. | Are you prepared to die? |
| A. | Yes, sir. Otherwise, I wouldn't be having the interview. |
| Q. | When do you want that to occur? |
| A. | Soon as possible. If it can be tomorrow, let it be tomorrow. If it can be today, let it be today. It doesn't make any difference. Once you're dead, you're dead. |

¶49. Wilcher contends that these statements should have been introduced to show his suicidal ideation and severe depression. Wilcher contends that his trial counsel were ineffective by failing to introduce this evidence.

¶50. As stated before, Wilcher made these statements while sitting on death row facing execution. It would have been difficult, if not impossible, for Wilcher's counsel to explain to the jury why Wilcher made such statements of hopelessness while suffering from depression without the jury learning or inferring from the circumstances surrounding those statements that Wilcher had previously been sentenced to death. We find that Wilcher's trial counsel cannot be said to be deficient for wanting to keep such damaging information from the jury.

¶51. Wilcher offers other arguments to support the contention that he was suffering from depression and suicidal tendencies. As stated above, a jury charged with deciding whether a defendant should be put to death may find the task easier knowing that the defendant wants to die.

¶52. There is a strong presumption that a counsel's conduct is reasonable and professional and that decisions made are strategic. *Murray*, 736 F.2d at 282. Wilcher's contention does not overcome that presumption and does not pass the standard of *Strickland*. Further, Wilcher cannot show that the introduction of those statements would have changed the jury's decision. *Mohr*, 584 So.2d at 430.

**Wilcher's counsel failed to prepare and present evidence which would have shown Wilcher's good character and his adaptability and good behavior in confinement.**

¶53. This sub-issue was made a part of Wilcher's original application, but was left out of the amended application. Regardless, we will address it.

24

¶54. Wilcher contends that his attorneys were ineffective because they failed to present evidence of his good behavior while incarcerated to refute any evidence by the prosecution that Wilcher had the propensity to kill again.

¶55. Wilcher's prison record from Parchman Penitentiary hardly reflects his good behavior. Among other things, Wilcher's record shows numerous violations, some violent, including assault on an officer, possession of a hacksaw blade, participation in a hunger strike on more than one occasion, setting fires, making threats of bodily harm to an officer, refusing to cooperate with disciplinary investigations, and engaging in or encouraging demonstrations that disrupted or interfered with security. Wilcher's attorneys cannot be said to be ineffective for failing to introduce his prison record into evidence. Wilcher's contention does not pass the first prong of *Strickland*.

### 4. Wilcher's counsel were ineffective for failing to properly develop and present mitigating evidence at trial.

¶56. In this ineffective assistance of counsel claim, Wilcher asserts the following:

> As demonstrated by the many affidavits of family and friends attached to this motion, the type of evidence and testimony that could have been introduced would have shown the interaction between the events of [Wilcher's] childhood and adolescence, his family and social life, and his behavior. Trial counsel failed to develop or present evidence, leaving the jury with only a sketch of Bobby Wilcher as being merely young and the son of an alcoholic who had an unpleasant upbringing.

¶57. Wilcher offers this Court a 107-page affidavit of Dr. Cunningham, a psychologist in Abilene, Texas, to support his contention that his trial attorneys failed to investigate mitigating psychological evidence. Wilcher asserts that Dr. Cunningham was able to review affidavits of Wilcher's family, friends, counselors, and an elementary school principal; records of the

25

institution where Wilcher was incarcerated as a child and an adult; and reports from counselors and mental health workers; and come up with twenty one mitigating factors "that could have been presented to the jury that singularly and collectively increased the likelihood of psychological and social maladjustment, morality deficits, poor impulse control, substance abuse and dependence, criminal activity, and violent criminal offending."

**Mitigating testimony offered at Wilcher's trial.**

¶58.    Wilcher's attorneys introduced evidence of mitigating factors through the testimony of many witnesses which included: Wilcher's mother, Mildred Wilcher Warren; his aunt by marriage, Claudia Wilkerson; Tommy Anderson, a neighbor of the Wilcher's while Bobby was a young boy; Dr. Smith, a specialist in addiction medicine; Father Stan Runnels, an Episcopal priest who met with Wilcher over the course of several years while Wilcher was incarcerated; Penny Wilcher Easterling, Wilcher's younger sister ; Dr. McLain, a specialist in the treatment of addiction medicines; and Dr. Johnson, a psychologist who testified as to Wilcher's developmental background.

¶59.    Wilcher's attorneys presented evidence to the jury that Wilcher's father was an abusive alcoholic; that Wilcher's mother and father had marital problems throughout his childhood; that Wilcher himself was an alcoholic and drug addict; that Wilcher was suffering from extreme mental and emotional disturbance on the night of the murders; and that Wilcher's capacity to appreciate the criminality of his conduct on the night of the murders was impaired.  This Court finds that Wilcher's attorneys' trial strategy was to portray Wilcher as an abused child with a

26

troubled family background who grew up to become an alcoholic and drug addict with extreme emotional disturbances and that he was substantially impaired on the night of the murders.

¶60.    This Court has held that the "failure to present a case in mitigation during the sentencing phase of a capital trial is not, per se, ineffective assistance of counsel." *Williams v. State*, 722 So.2d 447, 450 (Miss. 1998) (citing *Williams v. Cain*, 125 F.3d 269, 277 (5th Cir. 1997). In the case sub judice, Wilcher's attorneys did present a case in mitigation that can validly be said to be strategic.  Wilcher's attorneys also investigated and introduced mitigating evidence from three doctors, one of whom was a psychologist.  Just because Dr. Cunningham would have testified differently or may have done more, does not make Wilcher's representation deficient.  As the State correctly points out, in *Brown v. State*, 798 So. 2d 481 (Miss. 2001), this Court held:

> Brown is essentially arguing that Dr. Little's testimony was ineffective; however, he is not constitutionally entitled to the effective assistance of an expert witness. *Wilson v. Greene*, 155 F.3d 396, 401 (4th Cir. 1998).  The issue is without merit.

798 So.2d at 499.

¶61.    Further, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688-89.

¶62. Recently, the United States Supreme Court rendered its decision in *Wiggins v. Smith*, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In that case, Wiggins's counsel presented no mitigating evidence regarding Wiggins's horrible childhood. The Supreme Court determined that counsel's investigation into Wiggins's background as a youth was insufficient to make an informed strategic decision of presenting no mitigating evidence of Wiggins's life as a child.

> In finding that [Wiggins's counsels'] investigation did not meet *Strickland's* performance standards, we emphasize that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the 'constitutionally protected independence of counsel' at the heart of *Strickland*. 466 U.S., at 689. We base our conclusion on the much more limited principle that 'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigations." *Id.,* at 690-691. A decision not to investigate thus 'must be directly assessed for reasonableness in all circumstances.' *Id.,* at 691.

*Wiggins*, 123 S.Ct. at 2541.

¶63. The problems at issue in *Wiggins* are non-existent in the case at bar. Wilcher's attorneys did investigate his life as a child. The record is replete with testimony regarding Wilcher's family life as a child. The fact that such testimony is in the record is indicative of Wilcher's counsel's decision to introduce such evidence. We are not faced with the same question that the U.S. Supreme Court addressed in *Wiggins*. Further, the informed strategic decision of Wilcher's attorneys was to use what they learned through investigation of Wilcher's childhood in mitigation.

28

¶64. Wilcher cannot show that his attorney were deficient in a manner prejudicial to his case. Additionally, even if it were assumed that Wilcher's attorneys were deficient, Wilcher cannot show that the sentencing verdict that he received would have been different had his attorneys presented the additional mitigating factors that Dr. Cunningham submitted through his affidavit. Wilcher's claim does not pass the standard set forth in *Strickland*.

### 5. Wilcher's counsel failed to seek continuance in order to better prepare.

¶65. Wilcher's death sentence was vacated by this Court on October 7, 1993, and his case was remanded for resentencing. Wilcher asserts that his trial counsel was appointed in late March or early April of 1994. The trial was concluded, and Wilcher was sentenced to death with the judgment and sentence being entered on July 21, 1994.

¶66. Wilcher contends that his trial counsel was ineffective for failing to seek a continuance in order to better prepare. Wilcher cites *Triplett v. State,* 666 So.2d 1356 (Miss. 1995), wherein this Court found defense counsel in a manslaughter case ineffective for reasons which included his failure to seek a continuance. *Id*. at 1361. However, in *Triplett*, this Court stated:

> The Defendant is entitled to a basic defense. The basic defense set out herein is not intended to become a standard of review or a template or criteria to be applied in future cases where ineffective assistance of counsel is raised; however, it is descriptive of the failure, in this case, of the defense attorney to perform any act basic to the defense of the accused.

*Id*.

¶67. The situation in *Triplett* is quite different than the instant case. In *Triplett,* defense counsel should have sought a continuance until he had opportunity to interview every possible eyewitness, because the offense took place in county where neither the defendant, the victim,

nor the defense counsel lived, and the defense counsel had little knowledge of a number of eyewitnesses or their names. Further, the defense counsel had some witnesses tell different versions as to how the killing happened. There were numerous shortcomings in defense counsel's performance that this Court recognized in *Triplett*. Those shortcomings strongly suggested that the defense was poorly prepared. Such cannot be said about Wilcher's attorneys.

¶68. Wilcher's ineffective assistance of counsel claims arise from the resentencing phase of his trial. Wilcher's counsel, at that point, had the benefit of all of the State's evidence, both physical and testimonial, that had been introduced during the guilt phase, as well as all information regarding the proceeding of Wilcher's first sentencing trial. As the State correctly points out, Wilcher's attorneys filed an abundance of worthy pretrial motions including a "Motion for Discovery" and a "Request for Issuance of Subpoenas" consisting of twenty-five (25) potential witnesses. In *Triplett*, "[c]ounsel was derelict in failing to seek pre-trial discovery and in requesting witness subpoenas." *Id*. at 1361.

¶69. Wilcher offers no specific instance where a continuance was necessary. The only proof Wilcher offers to support this allegation is that his other allegations of ineffective assistance could have been prevented. In order to prevail on an ineffective assistance of counsel claim, "the post-conviction applicant to this Court must demonstrate with specificity and detail the elements of the claim." *Woodward v. State*, 635 So.2d 805, 808 (Miss. 1997). *Accord*, *Foster*, 687 So.2d at 1141.

¶70. Additionally,

> in order to sustain summary dismissal, of the ineffective assistance of counsel claim, under Miss. Code Ann. § 99- 39-11(2) (Supp.1997), the allegation must be alleged with specificity. "[H]e must specifically allege facts showing that

effective assistance of counsel was not in fact rendered, and he must allege with specificity the fact that but for such purported actions by ineffective counsel, the results of the trial court decision would have been different." *Smith v. State*, 434 So.2d 212, 219 (Miss.1983). See also Miss.Code Ann. § 99-39-9(1)(c) (1994).

*Ford v. State*, 708 So.2d 73, 75 (Miss. 1998).

¶71. There is no indication from the record that Wilcher's attorneys were in need of additional time or that their failure to obtain a continuance was deficient. Further, Wilcher has failed to demonstrate how the result of his sentencing trial would have been different had his attorneys obtained a continuance. Therefore, Wilcher's claim does not pass the standard set forth in *Strickland*, 466 U.S. at 687.

**6.      Wilcher's counsel were ineffective where they did not object or argue against the introduction of both murder convictions as aggravating circumstances.**

¶72. The Post-Conviction Collateral Relief Act provides a procedure limited in nature to review those matters which, in practical reality, could not or should not have been raised at trial or on direct appeal. *Turner v. State*, 590 So.2d 871, 874-75 (Miss. 1991); *Cabello v. State*, 524 So.2d 313, 323 (Miss. 1988). Wilcher argues that his capital murder conviction for the murder of Noblin was improperly introduced into evidence as an aggravating factor and that his attorneys made no objection or argument to prevent its introduction. Wilcher has alleged ineffective assistance of counsel. This argument is contrary to the record. These issues were presented to the trial court in pretrial motions presented by Wilcher's attorneys and subsequently denied. Wilcher's attorneys argued this point during the defense's objections to jury instruction S-1.

31

[By Mr. May, Wilcher's Attorney] The use of the conviction of the second homicide in this double murder case as an aggravator, violates the Eighth Amendment provision against cruel and unusual punishment, the double jeopardy clause of the Fifth Amendment, the due process and fundamental fairness guarantees of the Fourteenth Amendment.

The underlying issue of this ineffective assistance of counsel claim was not only raised in the trial court, this Court addressed it on direct appeal and found it to be without merit. *Wilcher II*, 697 So.2d at 1134-36. Therefore the issue is procedurally barred. Miss. Code Ann. § 99-39-21(3).

Thus, this issue is *res adjudicata*. That is, [the petitioner] unsuccessfully argued the merits of the issue on appeal, and now 'is attempting to relitigate this issue under a new heading.' *See Foster*, 687 So.2d at 1136. Where the merits of the issue have been considered and rejected on direct appeal, and the appellant 'has merely camouflaged the issue by couching the claim as ineffective assistance of counsel', the doctrine of *res adjudicata* applies. *See Id*. at 1135-37. If the merits of the underlying issue have been considered and rejected on direct appeal, then the appellant cannot show deficiency or prejudice in counsel's performance with regard to that issue. *See Id.* Therefore, [the petitioner's] argument is *res adjudicata* and without merit.

*Wiley v. State*, 750 So.2d 1193, 1200 (Miss. 1999). As we have noted, "[w]e must caution that other issues which were either presented through direct appeal or could have been presented on direct appeal or at trial are procedurally barred and cannot be relitigated under the guise of poor representation by counsel. *Foster*, 687 So.2d at 1129.

7.  **The admission of Wilcher's conviction for the murder of Odell Noblin was highly prejudicial.**

¶73.  Again, Wilcher argues that the discussion of both murders throughout the trial gave the jurors the opportunity to punish Wilcher for both crimes. Although Wilcher admits that his attorneys objected to the admission of some evidence that pertained to Noblin's death, Wilcher

faults his attorneys for not objecting to the overall merging of the two deaths throughout the entire trial.

¶74. A photograph of Noblin's body alone was offered in evidence, and Wilcher's attorneys objected because of its inflammatory nature and irrelevance to the murder of Moore. The trial judge stated:

> I am of the opinion the photograph has probative value and would be of benefit to the jury in deciding the issue of this case.
>
> Further, the two deaths is part of the *res gestae*. I fail to see how intelligently the offenses can be separated. To try to do so would be confusing to the jury, and for the further reason the fact that two persons were killed was developed yesterday during voir dire examination. To try to separate one's death from the other would be concealment of facts from the jury, and I think that would be prejudicial to the jury.

¶75. Next, Wilcher's conviction in Rankin County for the murder of Noblin was introduced, and Wilcher's attorneys again objected as to relevance. The objection was overruled. Wilcher asserts that his attorneys made no more objections after that point regarding the introduction of evidence pertaining Noblin's death.

¶76. As stated in the issue above, the introduction of evidence pertaining to the murder of Noblin was litigated at trial and discussed by this Court on direct appeal. The issue is barred. Miss. Code Ann. § 99-39-21(3); *Wiley*, 750 So.2d at 1200. Further, as will be discussed *infra*, the jury was properly instructed to sentence Wilcher for the death of Moore.

¶77. This Court has already ruled that the underlying issue is without merit. Therefore, Wilcher cannot succeed on his ineffective assistance of counsel claim. *Foster*, 687 So.2d at 1129.

**8. Wilcher was shackled before the jury in violation of his Sixth and Fourteenth Amendment rights to due process and a fair trial and**

**their corollaries under the Mississippi Constitution of 1890 and under the common law.**

¶78. Wilcher provided the unsworn statements of five jurors that purport that Wilcher was occasionally seen in shackles by those five jurors. First, Miss. Code Ann. § 99-39-9(1)(e) requires that a petitioner furnish affidavits to support his claims or show cause why he could not furnish these affidavits. Wilcher has done neither. An affidavit is "[a] written or printed declaration or statement of facts, made voluntarily, *and confirmed by the oath or affirmation of the party making it, taken before a person having authority to administer such oath or affirmation.*" Black's Law Dictionary, 58 (6th ed. 1990) (emphasis added). *See also Wilborn v. State*, 394 So.2d 1355, 1359 (Miss. 1981). Wilcher attaches and relies on numerous statements which he refers to as "affidavits." Many of these "affidavits" have not been notarized as made before any official. *See* Miss. Code Ann. § 11-1-1 (Rev. 2002). This Court will refer to these as "unsworn statements."

¶79. The unsworn statements that Wilcher purports to be from juror Cynthia R. King states: "The first day [Wilcher] was brought in to the courtroom in shackles. I don't think he was shackled on other days." The unsworn statement that Wilcher purports to be from juror Pauline O'Bryant states that she remembers " that [Wilcher] wore shackles around his ankles during parts of the trial." The unsworn statement that Wilcher purports to be from juror Cynthia Patton states: "I did notice he had new tennis shoes and ankle chains." Wilcher contends that juror Constance Young saw his legs in shackles, but the unsworn statement provided to this Court by Wilcher does not contain the paragraph where she purportedly makes such a

34

statement. Finally, the unsworn statement that Wilcher purports to be from juror Fay Maxwell states that Wilcher "had his ankles in shackles."

¶80. An unsworn statement of a juror is insufficient evidence to support Wilcher's allegation. *Russell v. State*, 849 So.2d 95, 119 (Miss. 2003). Miss. Code Ann. § 99-39-9(1)(e) requires that Wilcher furnish affidavits to support his claims or show cause as to why he could not furnish them. Wilcher has done neither. Without waiving Wilcher's failure to support his claim with affidavits, a discussion follows.

¶81. This Court has stated:

> McGilberry contends that he was denied a fair trial because he was allegedly seen in shackles by the jurors. First, this claim was not raised at trial or on direct appeal and is now procedurally barred from collateral review pursuant to Miss.Code Ann. § 99-39-21(1). Second, there is no substantial showing that McGilberry was actually seen in shackles by the jury. McGilberry instead offers the unsworn statement of an alternate juror who was released from service prior to deliberation. An alternate that does not sit on the panel has no effect on the outcome of the case. *Mack v. State*, 650 So.2d 1289, 1300 (Miss.1994). "Generally, we have not found the right to a fair trial to have been abridged where the defendant has been seen in the courtroom by the jury in shackles or handcuffs."*Brown v. State*, 690 So.2d 276, 287 (Miss.1996) (citing *Lockett v. State*, 517 So.2d 1317, 1329 (Miss.1987)). This issue is without merit.

*McGilberry v. State*, 843 So.2d 21, 27 (Miss. 2003).

¶82. The record indicates that Wilcher's attorneys filed a "Motion to Preclude the Sheriff's Department from Bringing Defendant into Court in Shackles, and to Limit the Number of Uniformed Officers in the Courtroom." This motion was sustained by order of the trial court. As the State correctly points out, the record is silent as to whether Wilcher appeared in the courtroom in shackles, and there is a presumption that the trial court's order was enforced.

¶83. Third, if Wilcher did appear in shackles, the issues was capable of being raised at trial or on direct appeal. Therefore the issue is procedurally barred. Miss. Code Ann. § 99-39-

35

21(1); *Wiley*, 517 So.2d at 1377-78. Without waiving the procedural bar, further discussion reveals that Wilcher cannot show prejudice to overcome the bar.

¶84.     Wilcher cites many cases to support his proposition that his right to a fair trial was violated by his being shackled in front of the jury.  Wilcher cites *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), and quotes that case as stating "[N]o person should be tried while shackled . . .except as a last resort."  In that case, the defendant was bound and gagged by the trial court because of his extremely disruptive behavior in the courtroom. The U.S. Supreme Court stated:  "But even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort." *Id.* "However, in some situations which we need not attempt to foresee, binding and gagging might possibly [sic] be the fairest and most reasonable way to handle a defendant who acts as Allen did here." *Id.*

¶85.     Wilcher also relies on *Marquez v. Collins*, 11 F.3d 1241, 1243-44 (5th Cir. 1994). However, in that case, the court held that shackles were warranted.  Further, the court stated:

> [B]ecause the trial judge is uniquely situated to make this judgment call he must be given considerable discretion. Given this discretion, it is not a question of whether, looking back, lesser restraints might have been adequate, although that is relevant. Rather, it is a question of whether it was reasonable to conclude at the time that the restraint was necessary. Put another way, necessity does not here trigger a type of "least means" analysis. That in retrospect some lesser restraint might have sufficed is not determinative. The trial judge must only have acted reasonably in responding to the scene before him using no more restraint than appeared necessary.
>
> "Shackling a defendant may be necessary to preserve the dignity of the trial and to secure the safety of the participants."

*Id.* at 1244.

36

¶86. In *Williams v. State*, 794 So.2d 1019, 1026 (Miss. 2001), this Court held that "[t]here is no unqualified right to appear unrestrained before the jury. Restraining procedures ought to be at the minimum level that will address the concern before the court. A defendant may be shackled to protect the safety of those in the courtroom, to deprive a flight-prone defendant from fleeing, or to preserve an orderly trial from a disruptive defendant."

¶87. This Court finds that even if this Court were to overcome the fact that the record is silent as to whether Wilcher was in shackles, it should be remembered that Wilcher had already been convicted twice of capital murder and had already received the death sentence for the murder of Noblin. *See Wilcher I*, 697 So.2d 1087. Further, Wilcher had a history of escaping from authority as a juvenile. Wilcher's argument is unsupported by affidavits as required by Miss. Code Ann. § 99-39-9(1)(e) or the record, is procedurally barred pursuant to Miss. Code Ann. § 99-39-21(1), and is without merit.

¶88. This issue is raised in Wilcher's Supplemental and Amended Motion under the main heading relating to ineffective assistance of counsel although no such issue is raised in his argument. Assuming that Wilcher is asserting that his attorneys were ineffective for not objecting to him being in shackles, Wilcher cannot overcome the first prong of *Strickland* as previously discussed.

**9. Wilcher's counsel were ineffective for failing to properly challenge the testimony of the county sheriff who was in charge of the investigation of Wilcher.**

¶89. The central theme underlying this claim is, again, that the defense should have been permitted to introduce Sheriff Warren's 1989 extortion conviction to impeach the sheriff's testimony. In this claim, Wilcher addresses three assignments of ineffective assistance of

37

counsel. First, Wilcher asserts that his attorneys were ineffective for failing to discover that Judge Gordon had represented Sheriff Warren and to argue that point at trial and on direct appeal. Second, Wilcher asserts that his attorneys were ineffective for failing to argue that the exclusion of Sheriff Warren's 1989 conviction from evidence denied Wilcher his fundamental right under the Confrontation Clause. Finally, Wilcher asserts that his attorneys were ineffective for failing to argue other examples of misconduct by Sheriff Warren or Deputy Kelly.

### Failure to discover and argue recusal issue.

¶90.    We find that even if it were assumed that Wilcher's attorneys were deficient for failing to discover that Judge Gordon had represented Sheriff Warren regarding his conviction in 1989, Wilcher cannot overcome the second prong of *Strickland*. To determine the second prong of prejudice to the defense, the standard is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mohr*, 584 So.2d at 430. Wilcher has not demonstrated how the outcome of the proceedings would have been different had his attorneys discovered that Judge Gordon's name appeared on Sheriff Warren's memorandum of understanding dated April 1, 1988, and the sheriff's entry of guilty plea dated April 8, 1988. Wilcher, therefore, cannot overcome the second prong of *Strickland*. Further, as to the underlying theme of Wilcher's claim, this Court has already determined that the trial court did not err by excluding evidence of the sheriff's 1989 conviction for impeachment purposes. *Wilcher II*, 697 So.2d at 1131-32.

### Failure to argue Confrontation Clause issue

¶91. In the second portion of his argument of ineffective assistance of counsel, Wilcher contends that his counsel were ineffective for not arguing the confrontation clause of the Sixth Amendment. Wilcher argues that the result was his inability to impeach Sheriff Warren's credibility with Sheriff Warren's prior conviction. As stated previously, this Court fully examined the trial court's decision not to allow the sheriff's 1989 conviction into evidence. *Wilcher II*, 697 So.2d at 1131-32.

¶92. In its discussion, the Court recognized that not allowing the sheriff's conviction into evidence was within the trial judge's discretion. M.R.E. 609(a)(1). In reviewing the trial judge's decision for an abuse of discretion, this Court stated:

> The trial judge stated that the conviction had no probative value because it occurred seven years after the sheriff's original testimony. In analyzing the probative value of the 1989 conviction, it is important to consider the unique way this evidence was presented to the jury. The trial judge properly considered the fact that the testimony given at the 1994 trial was given by someone who had not been convicted of a crime at the time he originally made the statements at issue. This would tend to decrease the probative value of the sheriff's 1989 extortion conviction. Furthermore, Wilcher has not demonstrated anything about the sheriff's life that would have influenced the investigation of the case at hand. Therefore, the trial judge did not abuse his discretion in excluding the conviction. *See also* **Turner v. State**, 573 So.2d at 1340. Wilcher's argument to the contrary is without merit.

*Wilcher II*, 697 So.2d at 1131-32.

¶93. The sheriff's prior testimony was admissible under M.R.E. 804. At the time Sheriff Warren gave his original testimony in 1982, Wilcher was present with counsel and the ability to confront Sheriff Warren was made possible. Therefore, Wilcher's confrontation clause rights were not violated. Wilcher's argument is without merit, and the ineffective assistance of counsel claim does not pass the first prong set out in *Strickland*. Further, this issue is

39

procedurally barred pursuant to Miss. Code Ann. § 99-39-21(3). "We must caution that other issues which were either presented through direct appeal or could have been presented on direct appeal or at trial are procedurally barred and cannot be relitigated under the guise of poor representation by counsel." *Foster*, 687 So.2d 1124, 1129.

### Other examples of Misconduct by Sheriff Warren and Deputy Otis Kelly

¶94.    Wilcher asserts that Sheriff Warren's violation of the Hobbs Act was not the first time that the Sheriff or Deputy Kelly were accused of misconduct. Wilcher asserts that in 1982, the same year he was convicted, Sheriff Warren and Deputy Kelly were sued in federal court for false arrest and false imprisonment. *See Dennis v. Warren,* 779 F.2d 245 (5th Cir. 1985). However, the federal court also recognized that "Sheriff Warren was not involved in any of the foregoing events." *Id.* at 247.

> The district court correctly recognized that Sheriff Warren was not liable under section 1983, since he was neither personally involved in the arrest or detention of Dennis, nor was there a casual connection between his acts and the violation of Dennis' federal rights. *See Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983). However, the district court held Warren liable for damages under a Mississippi statute which provides that '[a]ll sheriffs shall be liable for the acts of their deputies, and for money collected by them." MISS. CODE ANN.§ 19-25-19 (1972).

779 F.2d at 248.

¶95.    Wilcher finds fault in his attorneys for failing to argue the *Dennis* lawsuit to attack the credibility of Sheriff Warren and Deputy Kelly. *Dennis* clearly states that Sheriff Warren was not involved. Therefore, it could have done little harm to Sheriff Warren's credibility. Even assuming for the sake of argument that Wilcher's attorneys were deficient for failing to

40

attempt to introduce evidence of the ***Dennis*** lawsuit, it is obvious such would have had no bearing on the outcome of the trial. Therefore, Wilcher cannot overcome ***Strickland***.

> **10.** **Wilcher's counsel were ineffective for failing to object to the prosecution's putting on guilt phase, for failing to offer other available evidence to challenge or impeach testimony of robbery or kidnaping or underlying conviction, or for failing to effectively challenge the State's case.**

¶96. Wilcher's next assignment of ineffective assistance of counsel is nothing more than a disorganized rambling assertion of ineffective assistance of counsel at every turn. This Court will address each assertion of ineffective assistance of counsel.

### State's reintroduction of evidence from the guilt phase.

¶97. Wilcher's next claim is broken into several parts. First, he asserts that his attorneys were ineffective for failing to object to the State's reintroducing of evidence from the guilt phase at the sentencing phase. "[T]his Court has held that it is 'preferable' for the State to move for the reintroduction of the evidence produced at the guilt phase at the beginning of the sentencing phase." ***Turner v. State***, 732 So.2d 937, 953 (Miss. 1999) (citing ***Mack v. State***, 650 So.2d 1289, 1323-24 (Miss. 1994)). However, failure to move for this reintroduction is not fatal error. ***Id.*** As the State correctly points out, any attempt to object to the reintroduction of evidence from the guilt phase by Wilcher's attorneys would have been properly overruled. Therefore, Wilcher's attorneys were not deficient by failing to object.

### Residual doubt.

¶98. Second, Wilcher contends that his attorneys were ineffective for failing to attack the admission of his confessions. In his first direct appeal in 1984, Wilcher argued that his confession was inadmissible due to a violation of his Sixth Amendment right to counsel.

41

*Wilcher*, 448 So.2d at 933-34[5]. This Court found the issue to be without merit in 1984. *Id.* This Court determined the issue to be res judicata when it was brought up again on direct appeal after the resentencing trial. *Wilcher II*, 697 So.2d at 1128[6] (citing *Jordan v. State*, 518 So.2d 1186, 1189 (Miss. 1987)). At the resentencing trial, Wilcher's attorneys again attempted to prevent Wilcher's confessions from being introduced into evidence by arguing an intervening case of *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). *Wilcher II*, 697 So.2d at 1128. This Court distinguished *Michigan* from the facts in Wilcher's case and, again, found the issue to be without merit. *Wilcher II*, 697 So.2d at 1128.

¶99.    Wilcher now asserts that his attorneys were ineffective for failing to introduce evidence and argue that Wilcher's confession was coerced so as to show "residual doubt that the 'confession' may not have been obtained in the manner presented by the State." During a resentencing trial for a capital defendant, his guilt of capital murder is res judicata and may not be relitigated. *Jordan v. State,* 786 So.2d 987, 1029 (Miss. 2001) (citing *Holland v. State*, 705 So.2d 307, 321-29 (Miss. 1997)).

> [O]ther courts have permitted evidence of findings of guilt to collaterally estop the defendant in later proceedings. *Hernandez-Urine v. United States*, 515 F.2d 20, 21-22 (8th Cir.1975), cert. denied, 423 U.S. 1057, 96 S.Ct. 791, 46 L.Ed.2d 647 (1976); *United States v. Colacurcio*, 514 F.2d 1, 6 (9th Cir.1975). We adopt the logic of *Hernandez-Urine*[.] We hold that because of the finding of guilt by the prior jury, Holland is barred by res judicata from relitigating the prior jury verdict of guilt and is collaterally estopped in these proceedings from attacking his guilt.

---

[5] 1984 direct appeal for the murder of Noblin.

[6] 1994 direct appeal for the murder of Moore after the resentencing.

42

Holland argues that our case law requires the trial court to permit his presentation of evidence on whimsical or residual doubt. Our case law has prohibited counsel from doing more than asserting whimsical doubt at closing argument.

*Holland*, 705 So.2d at 325.

¶100. The State properly argues, based on Wilcher's inability to argue residual doubt in this case, that Wilcher's attorneys were unable to attack the murder, the robbery, or the kidnaping. Therefore, Wilcher cannot overcome the first prong of *Strickland*.

**The sheriff and deputy alone in Wilcher's bedroom.**

¶101. Next, Wilcher provides an affidavit from his mother stating that Sheriff Warren and Deputy Kelly were left unattended in Wilcher's bedroom for several minutes. She also states that she was in Wilcher's bedroom earlier that same morning and saw nothing out of the ordinary. According to her affidavit, Wilcher's father found jewelry the next day in Wilcher's bedroom that purportedly belonged to one of the victims. The affidavit does not say that Wilcher's mother looked where the jewelry was ultimately found.

¶102. Wilcher's mother further states in her affidavit that she was called as a witness in the 1994 trial, but Wilcher's attorneys never questioned her in regards to Sheriff Warren and Deputy Kelly being in Wilcher's room alone. Wilcher contends that his mother's testimony regarding the sheriff's and deputy's investigation in his room would have cast doubt on the reliability of Sheriff Warren's 1982 testimony regarding how the jewelry was found. For this, Wilcher asserts that his trial counsel were ineffective.

¶103. First, we find that this question, again, goes to arguing residual doubt which was just addressed. *See Jordan*, 786 So.2d at 1029. Second, nothing in the affidavit avers that

43

Wilcher's trial attorneys had knowledge of the facts that Wilcher's mother alleges. Third, this Court finds that even if it is assumed, for argument sake, that Wilcher's attorneys were deficient for not questioning Wilcher's mother in this regard, the second prong of *Strickland* cannot be met.

¶104. In evaluating whether the second prong has been met, the standard is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mohr*, 584 So.2d at 430. This means a "probability sufficient to undermine the confidence in the outcome." *Id*. Based on the overwhelming weight of the evidence against Wilcher, it cannot be reasonably maintained that, had his mother testified about the sheriff and deputy being alone in Wilcher's room, the outcome of the proceedings would have been different. This argument fails.

### DNA.

¶105. Wilcher next contends that his attorneys were ineffective for failing to obtain DNA testing on the exhibits in order confirm inconsistencies between the State's version and the purported "confessions" of Wilcher as given by Sheriff Warren's testimony. Again, this would be an attack on Wilcher's guilt which was affirmed by this Court on direct appeal in 1984, and as to which habeas corpus relief was denied by the federal courts. The matter of Wilcher's guilt for the capital murder of Noblin is res judicata and not subject to attack. *Jordan*, 786 So.2d at 1029; *Holland*, 705 So.2d at 321-29.

¶106. Wilcher's attorneys were not deficient for failing to obtain DNA evidence that could not procedurally be introduced. Therefore, Wilcher's claim does not satisfy the standards set forth in *Strickland*.

44

**11.    Wilcher's counsel were ineffective for failing to object to removal
of sentencing hearing to a death penalty prone county.**

¶107.  Wilcher's defense attorneys were able to obtain a change of venue for the re-sentencing from Scott County to Harrison County to insure that Wilcher received a fair trial from a jury that had not been prejudiced by news coverage in the local Scott County newspaper.  Wilcher maintains that a capital murder case in Harrison County is more likely to return a sentence of death than other counties in this state and that his attorneys were ineffective for not objecting when the trial court transferred venue to Harrison County.

¶108.  First, before addressing the merits of this claim, Wilcher does not provide any case or statutory authority to support his claim.  This Court has continually considered issues of error not supported by citation or authority as abandoned. *Thibodeaux v. State*, 652 So.2d 153, 155 (Miss. 1995).  It is the duty of an appellant to provide authority and support of an assignment of error. *Drennan v. State*, 695 So.2d 581, 585-86 (Miss. 1997); *Hoops v. State*, 681 So.2d 521, 526 (Miss. 1996); *Kelly v. State*, 553 So.2d 517, 521 (Miss. 1989); *Smith v. State*, 430 So.2d 406, 407 (Miss. 1983); *Ramseur v. State*, 368 So.2d 842, 844 (Miss. 1979).  Because Wilcher has failed to meet the burden of providing authority to support his assignment of error, he is procedurally barred. *Holland*, 705 So.2d at 329; *Drennan*, 695 So.2d at 585-86.  Without waiving the procedural bar, this issue also has not merit.

¶109.  In *Faraga v. State*, 514 So.2d 295, 307 (Miss. 1987), this Court held that defense counsel is under no duty to attempt to transfer venue and, therefore, the decision not to would fall within the realm of strategy. *Id. (*citing *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 297 (1986)).  We find that, likewise, the decision to obtain a venue change is within the realm of strategy.

¶110.  In *Faraga* we stated:

45

There must be a weighing of the odds. Most of the judges and trial lawyers of this state are aware of a statistical distinct disparity between counties in the willingness of juries to impose the death penalty. For some reason, also, some counties appear more "conviction prone" than others. We are also aware of defense lawyers who, in hindsight, have profoundly regretted a circuit judge sustaining their change of venue motion. In any event, it is unlikely the second prong of *Strickland*, could be hurdled based on the overwhelming evidence presented at trial.

514 So.2d at 307.

¶111. We find that it is also unlikely that Wilcher could overcome the second prong of *Strickland* given the overwhelming weight of the evidence against him. Further, it is difficult to see how Wilcher's death penalty sentence was strictly the result of his trial being held in Harrison County, or that the outcome would have been different but for the trial being held in Harrison County. Wilcher also received the death penalty at his resentencing trial in Rankin County for the murder of Noblin. We find that the resulting death penalty sentence coincides with the evidence against Wilcher rather than the venue being set in Harrison County. This issue is both procedurally barred and without merit.

### 12. Wilcher's counsel were ineffective in refusing to redact improper sentences from jury instructions.

¶112. At the resentencing trial, Wilcher proffered jury instruction D-4, which reads:

You are allowed to consider, as an aggravating circumstance in this case, whether "the defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person." The state has offered the conviction of Bobby Wilcher for the capital murder of Velma Odell Noblin as its evidence to support this aggravating circumstance.

The Court instructs the jury that the use of this aggravating circumstance does not allow you to punish Bobby Wilcher for any crime other that [sic] the killing of Katie Belle Moore. Indeed, the punishment you assess for the capital murder of Katie Belle Moore will be served in addition to his punishment for the capital murder of Velma Odell Noblin.

46

*Wilcher II*, 697 So.2d at 1136. The trial judge refused the instruction, but indicated that he would have given it if the last sentence were redacted. Defense counsel refused to amend the instruction and tendered as written. The instruction was denied. On direct appeal, this Court found no error by the trial court. *Wilcher II*, 697 So.2d at 1136. "Clearly, the instruction would have been granted, but for the last sentence . . . ." *Id.*

¶113. Wilcher now raises an ineffective assistance of counsel claim for his attorney's failure to agree with the trial court's suggested redaction. Wilcher alleges that jury instruction D-4 "was vital to clarifying the role of the jury regarding Wilcher's conviction for another murder arising out of the same incident." Because the suggested redaction was not made and the instruction was not given, Wilcher asserts that "it is possible that the jury sentenced him to death in the trial for the Moore murder as punishment for the murder of Noblin."

¶114. First, Wilcher cites no authority in support of his argument. He merely speculates as to how the jury reached its decision. This Court is not obliged to consider assignments of error when no authority is cited. *Hoops v. State*, 681 So.2d 521, 526 (Miss. 1996). Without waiving the procedural bar, Wilcher's argument is also without merit.

¶115. Defense counsel is presumed competent. *Johnson v. State*, 476 So.2d 1195, 1204 (Miss. 1985). The decision to redact a portion of the jury instruction or tender it in its entirety falls within the realm of trial strategy. However, assuming error only for the sake of argument, Wilcher does not make a showing that he was actually prejudiced.

¶116. This Court looks at jury instructions as a whole. *Caston v. State*, 823 So.2d 473, 506 (Miss. 2002). "Jury instructions will always be considered as a whole as opposed to the singling out of any instructions." *Goodin v. State*, 787 So.2d 639, 655 (Miss. 2001). The

47

State properly argues that sentencing instructions S-1B and S-4, in conjunction, adequately instructed the jury that they could only punish for the death of Katie Belle Moore.

¶117. After reviewing the jury instructions as a whole, we find that the jury was properly instructed. Sentencing instruction S-1B (part A) instructed the jury that the death penalty could only be returned if the jury first unanimously found from the evidence beyond a reasonable doubt that one or more of the following facts existed:

1. That the Defendant actually killed Katie Belle Moore;
2. That the Defendant attempted to kill Katie Belle Moore;
3. That the Defendant intended that the killing of Katie Belle Moore take place;
4. That the Defendant contemplated that lethal force would be employed;

The instruction also adequately instructed the jury as to the elements of aggravations and on weighing mitigating circumstances, if any, against the aggravating circumstances, if any. Sentencing instruct S-4 instructed the jury that Wilcher had already been found guilty of the capital murder of Katie Belle Moore. Therefore, the jury was properly instructed to return its verdict for the death of Moore, not Noblin. Wilcher's claim is barred and without merit.

### 13. Wilcher's counsel were ineffective for removing a request for a special venire.

¶118. During the pretrial motions hearing in Scott County, Wilcher's attorneys requested a special venire pursuant to Miss. Code Ann. § 13-5-77 (Rev. 2002). Wilcher's attorneys also informed the Court that a special venire would not be requested if venue was transferred from Scott County and the jury panel had not "been involved in any previous criminal cases prior to this one." The trial judge replied, "[I]f we go to another County, they will summons additional jurors." Venue in this case was ultimately transferred from Scott County to Harrison County.

48

Wilcher asserts that his attorneys were ineffective for failing to pursue a special venire in Harrison County.

¶119. This Court has stated that counsel's failure to request a special venire could easily be characterized as trial strategy. *Triplett*, 666 So.2d at 1361. This Court finds that nothing in the record indicates that jury panel was insufficient or that a special venire was necessary. Wilcher cites no specific instance of prejudice suffered by the failure to request a special venire in Harrison County. This issue does not pass *Strickland*.

**14.    Wilcher's counsel were ineffective for failing to move for recusal of the judge.**

¶120. In addition to the other arguments regarding whether Judge Gordon should have recused himself, which were discussed above and not included in not incorporate into the instant claim, Wilcher asserts that his attorneys were ineffective for failing to move for the recusal of Judge Gordon. This Court applies an objective standard in deciding whether a judge should have disqualified himself. Miss. Code of Jud. Conduct Canon 3. "A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality." *Jones v. State*, 841 So.2d 115, 135 (Miss. 2003) (citing *Jenkins v. Forrest County Gen. Hosp.*, 542 So.2d 1180, 1181 (Miss.1988)).

¶121. Wilcher contends that his attorneys were ineffective for failing to move Judge Gordon to recuse himself for bias. Wilcher attempts to prove that Judge Gordon was biased by showing that the judge had presided over the two 1982 trials in which Wilcher had been found guilty and originally sentenced to death; Judge Gordon had previously been a prosecutor; Judge Gordon transferred this case to another county based on its reputation; Judge Gordon would not allow Sheriff Warren's 1989 conviction into evidence; and Judge Gordon made judicial

49

comments indicating impartiality. Wilcher asserts that these facts could easily give the impression that Judge Gordon's judgment was influenced by his personal interest in this case.

¶122. One of Judge Gordon's actions that Wilcher offers to illustrate bias is the judge's decision not to allow the cross-examination of Sheriff Warren's testimony with regard to his extortion conviction in 1989. This Court has determined that Judge Gordon did not err by disallowing Sheriff Warren's conviction to be introduced for impeachment purposes. *Wilcher II*, 697 So.2d at 1131-32. Wilcher's allegation that Judge Gordon's decision was based on impartiality is misplaced. Therefore, Wilcher's contention that his attorneys were somehow deficient for not moving to recuse Judge Gordon, based on this argument, is without merit.

¶123. Wilcher also contends that certain statements made by Judge Gordon prove that he was predisposed to having Wilcher resentenced to death. In a pretrial motion, the defense moved to bar the use of certain aggravating circumstances, i.e., "especially cruel, heinous, and atrocious." Wilcher quotes a portion of Judge Gordon's response and asserts that the trial judge was biased for having stated that he was "proud that the [1982] trial of this case withstood the numerous motions and objections made."

¶124. Contrary to Wilcher's assertion, we conclude that the record, when placed in proper context, reveals that Judge Gordon was actually concerned about giving Wilcher a fair trial and not trying to insure that Wilcher was sentenced to death. After Judge Gordon heard arguments from both sides in the motion to bar the use of those aggravating circumstances, Judge Gordon responded:

50

| By the Court: | I'm going to permit aggravating circumstances being previously convicted of the crime of murder. This Court is going to reserve for a while for further consideration the ruling on the matter of especially cruel, heinous, and atrocious can be used. The problem that I am having, Gentlemen, and I'll be very candid with you, is I know that the Supreme Court has spoken to this matter. I know that was the law when the case was tried. There was an aggravating circumstance. I was proud that the trial of this case withstood the numerous motions and objections made. I want to make sure this case comes to some conclusion. So, as a matter of caution, I'm going to give it some thought. I'll make an announcement to you. |
|---|---|

We find that this comment in no way indicates partiality. It shows that Judge Gordon was proud that his rulings in the first trial were of sound judgment in accordance with the laws of this state and that he wanted to insure that no mistakes would be made during the re-sentencing trial.

¶125. In an attempt to further prove Judge Gordon's partiality, Wilcher quotes Judge Gordon as saying, "I am going to tell you, this case is one of the weaknesses of our law" and "[Wilcher's] a murderer, and then we go through all this process." These remarks come during objections to the jury instructions heard outside the presence of the jury. Again, these comments, when placed in proper context, do not show that Judge Gordon had a predisposition to insure Wilcher's death sentence.

¶126. The defense was trying to convince the trial court to give jury instruction D-23 which stated:

If after a reasonable and conscientious consideration of the evidence, and your duties as jurors, you cannot reach a unanimous decision concerning the existence of an aggravating sentence, or about the appropriateness of sentencing the Defendant to life in prison or death, you may cease deliberations and notify the Court in the following written form:

'We, the Jury, are unable to agree as to punishment.'

51

¶127. After considerable argument from both the prosecution and the defense, Judge Gordon rejected the instruction and stated:

> By the Court: I am going to tell you, this case here is one of the weaknesses of our law. There is no doubt of his guilt, absolutely no doubt. He is a guilty felon. I am not talking about because we are now in this stage in the sentencing phase. I'm talking about the facts established there is no doubt of his guilt. He's a murdered, and then we go through all this process.

Wilcher's guilt was a matter of law that had already been proven. The State avers that, when properly put into context by a full reading of this section of the transcript, it is easy to ascertain that the trial judge was frustrated at the back and forth arguing between the State and the defense over the issue of how long the jury should be allowed to deliberate and whether the jury should be instructed that they can determine what a reasonable time for deliberation would be.

¶128. This Court has stated that "[s]hould a case arise in which it is obvious that a judge had been partial, biased or prejudiced, and that his attitude and conduct had brought about an unfair trial, the Court would reverse the case and grant a new trial." *Garrett v. State*, 187 Miss. 441, 455, 193 So. 452, 455 (1940). However, this we find that Judge Gordon's remarks do not make an obvious showing that he is partial or that his conduct brought about an unfair trial.

¶129. Wilcher also attempts to show that Judge Gordon was biased because he was a prosecutor before he was a circuit court judge. Clearly, without nothing more to support how Wilcher was prejudiced, the fact that Judge Gordon had been a prosecutor is not indicative of bias. Further, Wilcher's counsel cannot be held to be deficient for failing to seek Judge Gordon's recusal on this basis.

¶130.  Wilcher also argues that Judge Gordon "purposefully transferred the case to Rankin County because of its reputation."  This Court finds that Wilcher meant Harrison County. Further, we find that Wilcher is again referring to his previous assumption that Harrison County was death-penalty prone.  Wilcher's assertion that Judge Gordon transferred the case to Harrison County because he was biased against Wilcher is nothing more than a conclusory allegation.

¶131.  Wilcher's assertion that his attorneys were ineffective for not moving for the recusal of Judge Gordon must fail.  The record does not reflect anything that would have warranted such a motion; therefore, counsel cannot be said to have been deficient for failure to do so. This issue does not pass the first prong of the *Strickland* test.

¶132.  Further, assuming for argument sake, that Wilcher's attorneys were deficient and the first prong of the *Strickland* test could be shown, the second prong under the *Strickland* test requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."' *Mohr*, 584 So.2d at 430. This means a "probability sufficient to undermine the confidence in the outcome." *Id.*  The question becomes whether there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.  *Strickland*, 466 U.S. at 695.  Based on the overwhelming weight of the evidence presented in this case, Wilcher cannot overcome this second prong of the *Strickland* test even if it were assumed the first prong is satisfied.  **15.      Wilcher's counsel were ineffective for failing to utilize Wilcher's peremptory challenges.**

¶133. Wilcher asserts ineffective assistance of counsel because his attorneys failed to utilize all of Wilcher's peremptory challenges at the conclusion of voir dire despite three of the selected jurors being related to someone who was either in law enforcement or an Assistant U.S. Attorney and an alternate juror selected was a former federal prosecutor who had previously prosecuted a capital murder case in California.

> The Fifth Circuit Court of Appeals considers an attorney's actions during voir dire to be a matter of trial strategy, which "cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be 'so ill chosen that it permeates the entire trial with obvious unfairness.' " **Teague v. Scott**, 60 F.3d 1167, 1172 (5th Cir.1995) (quoting **Garland v. Maggio**, 717 F.2d 199, 206 (5th Cir.1983)). Federal courts have held that an attorney's failure to exercise peremptory challenges does not give rise to a claim of ineffective assistance of counsel absent a showing that the defendant was prejudiced by his counsel's failure to exercise the challenges. *United States v. Taylor*, 832 F.2d 1187 (10th Cir.1987). *See also* **Mattheson v. King**, 751 F.2d 1432, 1438 (5th Cir.1985).

**Burns v. State**, 813 So.2d 668, 675-76 (Miss. 2001).

¶134. The discussion should first start with the alternate juror, Frank Violanti, a former federal prosecutor. We find that certainly any ineffective assistance of counsel claim regarding Violanti must fail because Wilcher cannot show prejudice when Violanti did not participate in jury deliberations. Further, even if Violanti had participated in deliberations, he was specifically asked if his experience as a prosecutor would affect his judgment and he replied ,"No, it would not."

¶135. Defense counsel did not use a peremptory challenge to excuse venire persons Margaret Graben, whose son was an Assistant U.S. Attorney ; Darlene Scheinsberg, whose husband works for U.S. Customs in a capacity not reflected by the record; or Muriel Vogle, whose son was in law enforcement. This Court has stated before that "there is no reason why an officer or an

54

officer's relative should not serve on a jury if otherwise qualified to follow the law and the evidence." **Bell v. State**, 725 So.2d 836, 846 (Miss. 1998) (citing **Mhoon v. State**, 464 So.2d 77, 81 (Miss. 1985)). There is nothing in the record that indicates that those jurors could not have been, or in fact were not, fair and impartial. Further, when defense counsel moved to dismiss Scheinsberg for cause, in part because she had been a victim of a violent crime, the court denied the request because she had stated that she could follow the law and the evidence.

¶136. This Court finds that Wilcher has not "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" **Stringer**, 454 So.2d at 477 (quoting **Strickland**, 466 U.S. at 689).

> **16.** **Wilcher's counsel were ineffective for failing to challenge the State's use of peremptory challenges to exclude African-American venire members.**

¶137. Wilcher contends that he was provided ineffective assistance of counsel when his attorney failed to make a challenge, based on **Batson v. Kentucky**, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to the peremptory strikes made by the State during the jury selection process. **Batson** challenges are utilized to contest whether one side is utilizing its peremptory challenges to exclude potential jurors because of some discriminatory basis. **McGilberry v. State**, 741 So.2d 894, 923 (Miss. 1999).

¶138. Wilcher's attorneys filed a motion prior to the beginning of trial that would preclude the prosecution from using peremptory challenges to exclude black jurors and members of other groups. This evidences their awareness of the potential **Batson** issues. Wilcher asserts that the State used thirteen of its peremptory strikes, and that four of those were used to

remove the only four black jurors presented to the State. He claims those jurors were Adrienne Robinson, Robert Parker, Miguel Nicholson and Dorothy Harper.

¶139. We find that the decision to make a *Batson* challenge falls within counsel's trial strategy and the wide latitude given to him. *See Strickland*, 466 U.S. at 686; *Hiter v. State*, 660 So.2d 961, 965 (Miss. 1995). For example, the defense may find it strategic to forego a *Batson* challenge and allow the State to exercise one of its peremptory challenges on a juror that the defense finds less favorable than a juror further down the list when, by all accounts, the defense attorney could have actually prevailed on a *Batson* challenge. Defense counsel is presumed competent. *Johnson v. State*, 476 So.2d at 1204.

¶140. Further, this Court finds that the record before this Court is silent on the racial composition of the jury making it impossible to conclude whether a *Batson* challenge was warranted by Wilcher's attorneys and if the failure to make such a challenge was prejudicial.[7] Even if it is assumed that the four jurors at issue were black, Wilcher has not proven that he was prejudiced in any fashion by his attorney's decision not to assert a *Batson* challenge. Wilcher only complains that his attorneys' "failure to raise a *Batson* objection prejudiced him because it led to the exclusion of all African Americans from the jury, which was unrepresentative of the community." This Court has held that,"[a]lthough the defendant does have a right to be tried by a jury whose members were selected pursuant to a nondiscriminatory criteria, the *Batson* court noted that the Sixth Amendment to the Constitution of the United

---

[7] In his motion for post-conviction relief, Wilcher provides an affidavit of William May, one of his trial attorneys. In the affidavit, May states that he placed a letter "B" next to the panel member's name on his list of venire members if he or she was black. That list is attached to the affidavit as "Exhibit B." The affidavit of May appears in Wilcher's Exhibits at tab 28. The State argues several points regarding May's "Exhibit B" in an attempt to discredit it reliability.

States has never been held to require that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the populations." *Simon v. State*, 688 So.2d 791, 806 (Miss. 1997).

¶141. Wilcher has not "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Stringer*, 454 So.2d at 477 (quoting *Strickland*, 466 U.S. at 689).

### 17.  Wilcher's counsel were ineffective for failing to limit the State's use of victim impact evidence at trial and final argument.

¶142. Wilcher asserts that he received ineffective assistance of counsel because his trial counsel did not try to limit the testimony of the victim's family to only that testimony which would serve to explain any events of the murder.  The record reflects that Wilcher's attorneys objected to the testimony given by the family members; however, Wilcher asserts that his attorneys were deficient for not specifically requesting that the trial court limit the testimony.  This assertion is incorrect.  During direct examination of Lisa Moore Warren, daughter of Katie Belle Moore, by the prosecution, the following dialogue took place:

| | |
|---|---|
| Q: | Lisa, what effect did your mother's murder have on your family? |
| By Mr. May: [Wilcher's attorney] | Now, if the Court, please, with all due respect, we would object to this.  This doesn't go to any aggravating circumstances that are in issue in this case. |
| By the Court: | Let me see counsel in chambers. |

Once in chambers, the following argument by Wilcher's attorney ensued.

| | |
|---|---|
| By Mr. May: | For the record, Your Honor, we would object to any testimony of victim impact, testimony along the lines that the district attorney was soliciting from the witness, on |

> the grounds that the issues before the court, for the jury to decide, are aggravating circumstances, and the balancing between mitigating circumstances, and determining proper punishment.

Wilcher's assertion is completely unsupported by the record. Wilcher's attorneys did attempt to limit the testimony.

¶143. Further, the issue of victim impact testimony was raised on direct appeal. *Wilcher II*, 697 So.2d at 1133-34. The same dialogue now at issue was discussed.

> Wilcher also argues that the trial was fundamentally unfair because the trial judge allowed the family of the victim, but not that of the defendant, to give their subjective impressions about the effect of the crime and the alternatives for punishment on them.
>
> The victim impact testimony to which Wilcher apparently refers was given by victim Moore's daughter, Lisa Moore Warren. Warren testified that, at the time of her mother's death, she was eighteen, her older brother was twenty-one, and they had two younger sisters, ages five and nine. Warren also testified as follows:
>
> > Q. [State:]   What effect did your mother's death and the manner in which it occurred have on your family?
> > A.          My brother and I immediately had to start raising my two little sisters, and to be eighteen and all of a sudden become a mother overnight, when you have lost your mother, unless you have been through it, you just don't understand. The girls would have nightmares at night, and there was no way that I could help them, because they wouldn't ever see their mother again, and neither would me or my brother. We just had to take one day at a time and try to get over some of the pain, but you never get over it. (Witness crying).
>
> Warren further stated that she had a six-year-old daughter, born after her mother died at age forty-five.

*Id.*

Victim impact evidence, if relevant, is admissible in the sentencing stage. *Davis v. State*, 684 So.2d 643, 661 (Miss.1996) (citing *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *Jenkins v. State*, 607 So.2d 1171, 1183 (Miss.1992)). This Court has held that evidence about the characteristics of the victim is relevant to the crime charged: 'The evidence offered was proper and necessary to a development of the case and true characteristics of the victim and could not serve in any way to incite the jury.' *Jenkins*, 607 So.2d at 1183 (evidence that victim was a mother, that she was a wife of four years, that she was shy and did not like to wear dresses because they exposed her legs was relevant). Therefore, the evidence about victim Moore's family was properly admitted. Furthermore, the United States Supreme Court has acknowledged that a State 'may legitimately conclude that evidence about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.' *Payne*, 501 U.S. at 827, 111 S.Ct. at 2609.

In this case, Bobby Glen Wilcher killed Katie Belle Moore by stabbing her fifteen times. The jury was entitled to know exactly who Katie Belle Moore was and what impact her death had. This information was relevant to the circumstances of the crime. Therefore, the admission of the victim's family's testimony was proper.

697 So.2d at 1134.

¶144. To support his ineffective assistance of counsel claim, Wilcher presents the same testimony from Moore's daughter that this Court reviewed on direct appeal. This Court held that "the evidence about victim Moore's family was properly admitted." *Id.* Therefore, this issue is procedurally barred. Miss. Code Ann. § 99-39-21(3); *Wiley*, 750 So.2d at 1200. Further, "[w]e must caution that other issues which were either presented through direct appeal or could have been presented on direct appeal or at trial are procedurally barred and cannot be relitigated under the guise of poor representation by counsel." *Foster*, 687 So.2d at 1129.

**18.    Trial counsel was ineffective for his closing by demeaning his own mitigating evidence.**

¶145. Wilcher asserts that his attorney was ineffective because, during closing argument, his attorney stated:

> Ladies and gentlemen, you know, all of the evidence you have heard, the evidence, the law, not me, not the judge, the law of the State of Mississippi, the law that you are bound to uphold, says if mitigating evidence, we are not trying to say it justifies what he did. We are not trying to say it excuses what he did. Folks, what we are trying to say is that to some degree, *as feeble as it may be*, it gives some kind of explanation to it.

(emphasis added). Wilcher then complains that the prosecutor picked up on this comment and argued that the defense conceded that its evidence was feeble.

¶146. First, before addressing the merits of this claim, Wilcher does not provide any case or statutory authority to support his claim. This Court has continually considered issues of error not supported by citation or authority as abandoned. *Thibodeaux v. State*, 652 So.2d 153, 155 (Miss. 1995). It is the duty of an appellant to provide authority and support of an assignment of error. *Drennan v. State*, 695 So.2d 581, 585-86 (Miss. 1997); *Hoops v. State*, 681 So.2d 521, 526 (Miss. 1996); *Kelly v. State*, 553 So.2d 517, 521 (Miss. 1989); *Smith v. State*, 430 So.2d 406, 407 (Miss. 1983); *Ramseur v. State*, 368 So.2d 842, 844 (Miss. 1979). Because Wilcher has failed to meet the burden of providing authority to support his assignment of error, he should be procedurally barred. *Holland. v. State*, 705 So.2d 307, 329 (Miss. 1997); *Drennan v. State*, 695 So.2d 581, 585-86 (Miss. 1997). Without dismissing the procedural bar, this issue also has no merit.

¶147. In *Faraga v. State*, 514 So.2d 295, 307 (Miss. 1987), Faraga was charged with capital murder, and his counsel, during closing argument, conceded that Faraga was likely guilty of murder, but not capital murder. This Court rejected this alleged claim of ineffective assistance

60

of counsel, noting: "[o]f course, no attorney representing a client who has pleaded not guilty should concede in his oral argument to a jury that his client was in fact guilty of the crime charged in the indictment." *Id*. However, as a tactical decision, certain points may be conceded, such as the defendant's possible coloring of the truth, in the foremost effort to set forth the most convincing argument given the circumstances in which the attorney finds his client. *Id*. at 308.

¶148. "Attorneys are permitted wide latitude in their choice and employment of defense strategy." *Hiter v. State*, 660 So.2d 961, 965 (Miss. 1995) (citing *Edwards v. State*, 615 So.2d 590, 596-97 (Miss. 1993)). In this case, Wilcher's overall strategy was to convince the jury that he should be given life imprisonment without parole instead of death. "You've got three choices today. Death, and life without parole, and life with parole. Life with parole I'm not looking for. I'm asking you for life without parole." The statements made by Wilcher's attorney were a disclaimer made to prevent the jury from thinking that Wilcher was somehow under the impression that the mitigating factors justified his actions. The attorney was simply telling the jury that the mitigating factors may explain why Wilcher committed the murders. The reference "as feeble as it may be," may have been the attorney's way of instructing the jury to consider the mitigating factors regardless of how feeble the jury may find them to be.

¶149. Defense counsel is presumed competent. *Johnson v. State*, 476 So.2d 1195, 1204 (Miss. 1985); *Washington v. State*, 620 So.2d 966 (Miss. 1993)."While there might have been a more artful way to pursue this strategy, it was a legitimate strategy and thus, is not grounds for an ineffective assistance claim." *Powell v. State*, 806 So.2d 1069, 1077 (Miss. 2001). Wilcher has not overcome the presumption that his attorneys statements were strategic.

61

¶150. Even if Wilcher's attorney's statement amounted to deficient performance, Wilcher is unable to show a resulting prejudice that denied him of a fair trial. It cannot be said that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Schmitt v. State*, 560 So.2d 148, 154 (Miss. 1990). Wilcher ineffective assistance of counsel claim does not pass the standard in *Strickland*.

**19.    Wilcher's counsel were ineffective for failing to formulate a sound trial strategy for Wilcher's trial.**

¶151. Wilcher next asserts that his trial attorneys were ineffective because they conducted voir dire and the penalty trial without a cohesive strategy. This issue is unsupported and without merit.

¶152. First, Wilcher offers no authority to support his claim that counsel was deficient. He only offers this Court bare allegations. This Court is not obliged to consider assignments of error when no authority is cited. *Hoops*, 681 So.2d at 526. However, without waiving the procedural bar, further discussion reveals the issue to be without merit.

¶153. Wilcher asserts that his trial attorneys failed to introduce available mitigating evidence and failed to properly challenge the State's version of events. Wilcher does not provide any specific mitigating evidence that counsel should have offered in addition to the numerous mitigating factors that were offered, nor does Wilcher specify how or with what evidence counsel should have "properly challenged the State's version of events."

¶154. Wilcher further complains that his attorneys' strategy was merely to assert that Wilcher had an alcoholic, abusive father. The record, however, reveals that Wilcher's father's attributes were only a part of the overall picture that Wilcher's attorneys were attempting to paint.

Testimony was offered not only about Wilcher's home life as a boy with a drunken father, but also regarding Wilcher's own drug and alcohol addiction, as testified to by Dr. Smith and Dr. McLain. Additionally, Dr. McLain testified that the combination of drugs that Wilcher had been using put him "under the influence of extreme mental or emotional disturbance" at the time of the murders. Wilcher's attorneys also offer the testimony of Dr. Johnson, a criminal psychologist. Dr. Johnson testified that, at the time of the murders, Wilcher "was suffering from depression, from anxiety, chronically under-employed, with no clear direction in his life, very pessimistic, fatalistic, attitude." Dr. Johnson also testified that Wilcher "really could not appreciate the legal criminal nature of his actions at the time."

¶155. During closing argument, trial counsel attempted to show that Wilcher killed because he was an "extremely disturbed person" suffering from "extreme mental and emotional disturbance." They attempted to persuade the jury that the turbulence of Wilcher's life at home, i.e., his abusive alcoholic father, was "the kind of background that will make somebody disturbed, extremely disturbed. . . ." It is quite clear from the record that the trial strategy put forth by Wilcher's attorneys went far beyond Wilcher's drunken father. In fact, the record reveals that Wilcher's attorneys tried to show the father was only a contributory part of Wilcher's disturbed personality. This issue is both barred and without merit.

**20. Wilcher's counsel were ineffective for failing to object or preserve errors for review.**

**21. Wilcher's counsel were ineffective for failing to preserve errors for review that are now raised in this post-conviction application.**

¶156. Wilcher asserts that his attorneys were ineffective for failing to object and preserve issues for review during the trial. Wilcher also contends that his attorneys were ineffective

63

because those issues were not preserved for review by the appellate court. Because of the similarities in these two issues, they will be discussed together.

¶157. In Wilcher's first post-conviction application filed before the Supplemental and Amended Motion, he contends that he was prejudiced by his counsels' failures to object on several occasions. However, he only refers to one such occasion which was counsels' failure to claim, prior to close of evidence, that the use of Noblin's murder and the underlying felony as aggravating circumstances violates the Fifth and Eighth Amendments.

¶158. This issue was addressed, *supra*. As discussed, this issue was procedurally barred pursuant to Miss. Code Ann. § 99-39-21(3) because this Court dealt with the introduction of such aggravating circumstances evidence on direct appeal. *Wilcher II*, 697 So.2d at 1134-36. Because this Court determined that no error was committed by admitting evidence of Noblin's murder to be introduced as an aggravating circumstance, Wilcher cannot succeed on an ineffective assistance of counsel claim. The issue is procedurally barred. *Wiley*, 750 So.2d at 1200. "We must caution that other issues which were either presented through direct appeal or could have been presented on direct appeal or at trial are procedurally barred and cannot be relitigated under the guise of poor representation by counsel." *Foster*, 687 So.2d at 1129.

¶159. Wilcher offers no other specific instance of counsels' failure to preserve a fundamental error at trial; therefore, he has failed to demonstrate that his counsel's performance was deficient. *Strickland*, 466 U.S. at 687. This claim for ineffective assistance of counsel must fail.

¶160. In his Supplemental and Amended Motion, Wilcher asserts that his attorneys were ineffective at the trial level for failing to object on several occasions and thereby preserve the

64

record for appeal. However, Wilcher does not specify which instances should have prompted objections by his attorneys. Wilcher only alleges that his attorneys failed to preserve the record during bench conferences. Wilcher does not provide specific instances where this occurred. Again, his conclusory allegations will not support a claim for ineffective assistance of counsel where he fails to demonstrate that his attorneys were deficient.

¶161. As for the ineffective counsel claim at the appellate level, Wilcher asserts that his attorneys were ineffective for failing to raise each of the issues now presented to this Court in his post-conviction application. As will be discussed in the "accumulation of error" issue presented by Wilcher as claim "I" *infra*, a review of the record, the briefs, and the arguments shows that there were no individual errors which required reversal and that there is no aggregate collection of minor errors that would, as a whole, mandate a reversal of either the conviction or sentence. Therefore, the failure by Wilcher's attorneys to present issues at the trial or appellate level that Wilcher now presents to this Court in his post-conviction application was not deficient and cannot pass the first prong of **Strickland**.

¶162. Further, many of the claims presented by Wilcher in his post-conviction application were, in fact, presented by his trial attorneys, both at the trial and appellate levels, hence they are procedurally barred. Miss. Code Ann. § 99-39-21(3). This Court recognizes that there are claims that were not capable of being raised at the trial or appellate level, such as claims for ineffective assistance of counsel. As our Court of Appeals has correctly observed,

> It is unusual for this [c]ourt to consider a claim of ineffective assistance of counsel when the claim is made on direct appeal. This is because we are limited to the trial court record in our review of the claim and there is usually insufficient evidence within the record to evaluate the claim. *See Edwards v. State*, 797 So.2d 1049, 1060 (¶30) (Miss.Ct.App.2001). The Mississippi Supreme Court has stated that, where the record cannot support an ineffective assistance of counsel claim on direct appeal, the appropriate conclusion is to deny relief, preserving the defendant's right to argue the same issue through a

65

petition for post-conviction relief. ***Read v. State***, 430 So.2d 832, 837 (Miss.1983). This Court will rule on the merits on the rare occasions where "(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." ***Colenburg v. State***, 735 So.2d 1099, 1101 (¶5) (Miss.Ct.App.1999).

***Aguilar v. State***, 847 So.2d 871 (Miss. Ct. App. 2002).

¶163. This Court finds that this Wilcher fails to provide anything more than unsubstantiated allegations. Therefore, Wilcher has failed to demonstrate that his attorneys were deficient. This claim does not pass ***Strickland***.

### 22. Wilcher's counsel failed to investigate Wilcher's case.

¶164. This issue does not appear in Wilcher's Supplemental and Amended Motion as a separate claim; however, it was briefly raised in Wilcher's ineffective assistance of counsel claim regarding the failure to cross-examine Dr. Stanley discussed above. In the event that it was omitted in the supplemental by an oversight, we will address it.

¶165. In this final allegation of ineffective assistance of counsel, Wilcher asserts that his attorneys were ineffective for failing to fully investigate Wilcher's case. First, Wilcher contends that if his attorneys had investigated his case, they would have discovered that the State's expert witness, Dr. Stanley, offered in rebuttal, "has on a multitude of occasions found that various defendants were conscience-less psychopaths." To support his contention, Wilcher cites eighteen cases in which Dr. Stanley testified.

¶166. Wilcher offers no proof that his attorneys were unaware of the number of cases Dr. Stanley had participated in prior to Wilcher's case or that they were unaware of the testimony Dr. Stanley gave in those cases. Wilcher's assertion that his trial would have had improved

66

results if his attorneys had questioned Dr. Stanley in this regard is speculative at best. It is plausible that any cross-examination of Dr. Stanley regarding prior cases would have given more credibility to his testimony in the present case and given the State further ammunition. Therefore, the decision not to cross-examine Dr. Stanley, or bring light to the prior cases that Dr. Stanley had been involved in, falls within the ambit of trial strategy. *Powell v. State*, 806 So.2d 1069, 1078 (Miss. 2001). Wilcher fails to make a showing that his attorneys were deficient; thus, this issue does not pass *Strickland*.

## C. WHETHER THE STATE'S INVOCATION OF HIGHER BIBLICAL LAW VIOLATES BOBBY WILCHER'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS, AND UNDER ARTICLE 3, SECTION 14 OF THE MISSISSIPPI CONSTITUTION AND DEFENSE COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE THIS ISSUE AT TRIAL.

¶167. Wilcher begins this argument by admitting that his attorneys, during closing argument, made references to the Bible. Wilcher's attorneys told the jury that God has set examples for all of us on how to deal with people who have broken the law or have killed. Wilcher's attorney then encouraged the jury to follow those examples, "examples that are infallible."

> Adam and Eve, the very first man and woman, what did they do? They committed at the time the only wrong thing they could do. They ate of the forbidden fruit, the only thing they were instructed not to do. They did it. The worst possible thing ever they could do. What did God Do? He didn't kill them. He didn't strike them off the face of the earth. He banished them. He removed the from the garden. He removed them from society.

> Cain, who was Cain? The first son in the first family, Adam and Eve's son. What does Cain do? Cain murders his own brother. What is done to Cain? He wasn't executed. Cain was banished. He was ordered away from society for the remainder of his life.

> King David, from whom we gained all the Psalms and many of the Proverbs. King David killed. What was done to him? Punishment by untold afflictions and

67

hardships that he had imposed upon hi, but he wasn't executed. God didn't order that he be killed.

Moses, the giver of the laws, the man from whom the Ten Commandments came. Moses killed. What happened to him? He's banished from the promised land without ever seeing it, the journey that he was about for his entire life consisted of. He was banished.

The greatest apostle ever, the greatest person known to Christians as a missionary, Paul. Paul was a murderer of Christians, a killer of as many he could kill. What happened to Paul? He wasn't executed. His life was turned around, and he was transformed into one of the greatest men that ever walked the face of the earth.

In every situation, folks, God punished. He did, he punished; but, how? Not by death, but by punishment other than death. Many times banishment.

Yes, there are passages in the Bible, perhaps, that you can interpret to say in following man's law, if you kill, you should be killed. I submit to you, folks, that's man's law and God's example cannot be undermined.

Wilcher asserts that the prosecutor used the Bible to argue that there was no need to weigh mitigating and aggravating factors. Wilcher asserts that the State's argument was "clearly highly improper" and that it rendered the sentencing "fundamentally unfair" in violation of the Eighth Amendment and of the Due Process Clause of the Fourteenth Amendment. Wilcher argues to this Court that the impact of the State's argument was to instruct the jury that the greater authority, i.e., God's law, mandated Wilcher's death for Moore's death.

¶168. The prosecutor's comments on the Bible during closing argument were as follows:

Mr. May has injected religion into this, and I'm glad that he did. I'm glad to respond to that. When God first instituted government, he gave man an important tool for self-government, the authority to execute justice, to protect human life and safety, by means of capital punishment. It's found in the first book of the Bible, Genesis 9-6. Who so shedeth man's blood, by man shall his blood be shed.

68

> You might think to yourself, if you are a student of the Bible, that's in the Old Testament, the New Testament is different. Not so. The last book of the Bible, Revelations, Chapter 13, Verse 10. If anyone slays with the sword, with the sword he must be slain.
>
> Nowhere in between the first and the last books of the Bible is there language against capital punishment.

¶169. This issue is procedurally barred except for the ineffective assistance claim that is attached. Miss. Code Ann. § 99-39-21(1). There was no objection made to the State's biblical argument at trial or on direct appeal. Wilcher also fails to show prejudice to overcome the procedural bar. Without waiving the procedural bar, a discussion on the merits ensues.

¶170. This Court has continuously held that arguments with religious or biblical references are permissible subjects for comment during closing argument, especially when the biblical comments made by the prosecutor are in response to those made by the defense. *Berry v. State*, 703 So.2d 269, 281 (Miss. 1997); *Carr v. State*, 655 So.2d 824, 852-53 (Miss. 1995).

¶171. In *Carr*, Carr argued that the prosecutor's Biblical references during the State's closing arguments at the sentencing phase deprived him of a fair trial. This Court held:

> Defense counsel made use of Biblical references in his own closing arguments as well, which renders [Carr's] position highly tenuous. As Carr failed to make a contemporaneous objection to the Biblical references, this issue is barred from review by this Court. *Hansen v. State*, 592 So.2d 114, 140 (Miss.1991). However, even if the issue were not procedurally barred, there is no merit to Carr's argument. This Court has continually held that counsel is afforded broad latitude in closing argument. This latitude, set out by the Court in *Nelms & Blum Co. v. Fink*, 159 Miss. 372, 382-383, 131 So. 817, 820 (1930), has been referred to in the context of capital cases. In *Nelms*, we stated that "[c]ounsel may draw upon literature, history, science, religion, and philosophy for material for his argument." *Id*. at 382-384. *See Hansen v. State*, 592 So.2d 114, 139-140 (Miss.1991); *Shell v. State*, 554 So.2d 887, 899 (Miss.1989), vacated on other grounds, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990); *Johnson v. State*, 416 So.2d 383, 391 (Miss.1982).
>
> This assignment of error is procedurally barred; alternatively, it has no merit.

*Carr,* 655 So.2d at 852-53.

¶172.  The record here clearly reflects that the prosecutor was responding to the biblical argument made by Wilcher's attorney.  As stated above, it is not improper for the State to make the biblical comments that were made, and even more proper given that the comments were in response to those made by the defense.  This issue is without merit.

¶173.  Wilcher's ineffective assistance of counsel claim for counsels' failure to object to the State's biblical references must also fail.  Wilcher cannot show that counsel was deficient for failing to object to something that was not objectionable.  Wilcher cannot pass the first prong of *Strickland*.

> **D.    WHETHER THE TRIAL COURT IMPROPERLY EXCUSED POTENTIAL JURORS IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS AND DEFENSE COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE THIS AT TRIAL AND ON DIRECT APPEAL.**

¶174.  Wilcher contends that his Sixth Amendment right to an impartial jury was violated when the trial court unconstitutionally excused two potential jurors for cause under *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 481 (1985) because they expressed their opposition to the death penalty.  Those jurors were Varnado and Dedeaux.

> Failure by a prisoner to raise objections, defenses, claims, questions, issues or errors either in fact or law which were capable of determination at trial and/or on direct appeal, regardless of whether such are based on the laws and the Constitution of the State of Mississippi or of the United States, shall constitute a waiver thereof and shall be procedurally barred, but the court may upon a showing of cause and actual prejudice grant relief from the waiver.

Miss. Code Ann. § 99-39-21(1).  Wilcher objected to the potential jurors being excused for cause at the trial level and the objection was overruled.  Wilcher did not raise the issue on

70

direct appeal. We find that the issue was ripe for direct appeal and is now procedurally barred.

However, without waiving the procedural bar, a discussion of Wilcher's claim ensues.

¶175. The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright*, 469 U.S. at 424. During voir dire, the following question was asked of the potential jurors:

> Now, the first question I ask of you, do any of you have any conscientious or religious scruples against the infliction of the death penalty, when the law authorizes the infliction of the death penalty in proper cases, and the testimony warrants it?
>
> If you do have such conscientious scruples, would you, please, raise your hand?

Both venire members Varnado and Dedeaux raised their hands.

¶176. Voir dire continued in chambers with these two venire member separately. The following examination of juror Varnado by the Court occurred:

> Q. Mr. Varnado, there is nothing wrong. What we are doing, we are going to talk to you further regarding your conscientious scruples you have indicated that you have. Listen to my question now. There's nothing wrong with you. It's just a procedure that we must follow. Listen to my question, Mr. Varnado. You have stated that you do have conscientious scruples or religious scruples against the infliction of the death penalty. Can you, nevertheless, and regardless of your conscientious scruples against the infliction of the death penalty, follow the testimony of this case, and the instructions of the Court that I will give you on the law, and return a verdict inflicting the death penalty, if you are convinced from the evidence, you being the judge of the weight and worth of the evidence, and you find the circumstances of the case warrant the infliction of the death penalty? Can you do that?
> A. No, sir, I cannot.
> Q. Let me ask you another question, Mr. Varnado. Because of your conscientious scruples against the infliction of the death penalty, would

71

you automatically, because of having conscientious scruples against the infliction of the death penalty, vote against the death penalty without regard to the evidence of the case?

A. Yes, I would, because I don't believe in the death penalty.

Q. All right, sir. Mr. Varnado, are you telling me that you are irrevocably committed against the infliction of the death penalty?

A. Yes, I am.

¶177. Following the trial court's questioning, the prosecutor had no questions. In an attempt to rehabilitate Varnado, the following questions were asked of him by Mr. Pearce, one of Wilcher's attorneys:

Q. Mr. Varnado, if you were a juror in this case, are you telling us that under no circumstances would you follow the law if you were instructed that you should consider the death penalty?

A. As I've said before, my religious beliefs would not let me even consider the death penalty.

Q. All right, sir. Would your religious beliefs prevent you from following the Court's instructions of law to you, if the death penalty was an option?

A. I might would follow the instructions, but there's no way that I would ever vote for a death penalty.

¶178. The following examination of juror Dedeaux by the Court occurred:

Q. Mrs. Dedeaux, you have stated in the Courtroom that you have conscientious or religious scruples against the infliction of the death penalty. Can you, nevertheless, and regardless of your conscientious scruples against the infliction of the death penalty, follow the testimony of this case, and the instructions of the Court that I will give you on the law, and return a verdict inflicting the death penalty, if you are convinced from the evidence, you being the judge of the weight and the worth of the evidence, and you find that the circumstances of the case warrants the infliction of the death penalty?

A. No, sir, I could not.

Q. Now, I have another question, Mrs. Dedeaux. Because of your conscientious scruples against the infliction of the death penalty, would you automatically, because of having conscientious scruples against the infliction of the death penalty, vote against the infliction of the death penalty, without regard to the evidence of this case?

A. I don't feel that I could vote on it.

> Q. And, would you automatically vote against the infliction of the death penalty because of your scruples?
> A. Yes, sir.
> Q. Now, Mrs. Dedeaux, are you irrevocably committed against the infliction of the death penalty?
> A. Yes, sir.
> Q. You cannot be retrieved?
> A. No, sir.
> Q. Regarding the testimony of the case?
> A. No, sir.

¶179. Again, following the trial court's questioning, Wilcher's attorney attempted to rehabilitate Dedeaux through the following exchange:

> Q. Mrs. Dedeaux, let me ask you this. If you were a juror on this case, could you follow the law that the judge would give you in jury instructions, even if that law authorized you to vote for the death penalty?
> A. I could not vote for the death penalty, even by following the case.
> Q. Mrs. Dedeaux, are you aware if you were a juror, that you would have the option of voting life imprisonment or the death penalty, if you were a juror? Do you understand that?
> A. Yes.
> Q. Now, my question to you is, if you were a juror, could you follow the law and vote the way you see the evidence requires you to vote, even if one of the options is the death penalty?
> A. No.
> Q. You could not follow the law?
> A. I don't think I could.
> Q. Are there no circumstances where you could return a death penalty?
> A. No.

¶180. This Court finds that there is no question that these two venire members were properly excused for cause. "[T]he quest is for jurors who will conscientiously apply the law and find the facts. That is what an 'impartial' jury consists of, and we do not think, simply because a defendant is being tried for a capital crime, that he is entitled to a legal presumption or standard that allows jurors to be seated who quite likely will be biased in his favor." *Wainwright*, 469 U.S. at 423.

¶181. Wilcher also argues that he

was denied an impartial jury taken from a representative cross section of the community, and thus *Wainwright* was unconstitutionally applied to [him]. Specifically, *Wainwright* allows the dismissal of these potential jurors based upon these jurors' personally beliefs regarding the death penalty, thus eliminating a substantial portion of the population in capital cases, including the three [sic] jurors dismissed in this case. Such exclusion violates Wilcher's Sixth Amendment right to an impartial jury.

¶182. Again, this issue was capable of being raised on direct appeal. Therefore, the issue is procedurally barred. Miss. Code Ann. § 99-39-21(1); *Wiley*, 517 So.2d at 1377-78. Further, without waiving the procedural bar, the issue is also without merit.

¶183. This Court finds that *Wainwright* does not allow the dismissal of potential jurors based on their personal belief regarding the death penalty. We find that *Wainwright* permits the dismissal of potential jurors when a "juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 424. Additionally, the U.S. Supreme Court has stated,

nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) *that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them,* or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.

*Witherspoon v. Illinois*, 391 U.S. at 522 n.21 (emphasis added).

¶184. This Court and the United States Supreme Court have settled the question presented by Wilcher. This Court has stated:

Jordan alleges that the exercise of such peremptory challenges denied him a jury composed of a fair cross-section of the community. We have held that a prospective juror's views on the death penalty do not make one a member of a distinctive class protected by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712,

74

90 L.Ed.2d 69 (1986), and its progeny. *Holland*, 705 So.2d at 340-41. Therefore, the State was not prohibited from exercising peremptory challenges to strike jurors based on their beliefs concerning the death penalty. *Id.* at 341. Additionally, excusing all jurors who have conscientious scruples against the death penalty does not deny a defendant his right to a representative cross-section of the community. *West v. State*, 485 So.2d 681, 685 (Miss.1985). Therefore, these issues are without merit.

*Jordan v. State*, 786 So.2d 987, 1028-29 (Miss. 2001).

¶185.  Further, the U.S. Supreme Court has stated:

The Court's reasoning in *McCree* requires rejection of petitioner's claim that "death qualification" violated his right to a jury selected from a representative cross section of the community. It was explained in *McCree* that the fair cross section requirement applies only to venires, not to petit juries. *Id.*, at 173, 106 S.Ct., at 1765. Accordingly, petit juries do not have to "reflect the composition of the community at large." *Ibid*. More importantly, it was pointed out that, even if this requirement were applied to petit juries, no fair cross section violation would be established when "*Witherspoon*-excludables" were dismissed from a petit jury, because they do not constitute a distinctive group for fair cross section purposes. *Id.*, at 174, 106 S.Ct., at 1765.

*Buchanan v. Kentucky*, 483 U.S. 402, 415, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987) (citing

*Lockhart v. McCree*, 467 U.S. 162, 173-74, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986)).

¶186.  This issue is not only procedurally barred pursuant to Miss. Code Ann. § 99-39-21(1);

it is also without merit.

**E.    WHETHER WILCHER WAS DEPRIVED OF HIS RIGHT TO A FAIR AND IMPARTIAL JURY UNDER THE SIXTH AND FOURTEENTH AMENDMENTS, AND UNDER ARTICLE 3, SECTIONS 14 AND 26 OF THE MISSISSIPPI CONSTITUTION BY JURORS'S FAILURE TO REVEAL AUTOMATIC DEATH PENALTY TENDENCIES; DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE STATE'S UNCONSTITUTIONAL ARGUMENT.**

¶187.   During voir dire, the venire persons were repeatedly asked whether they were

predisposed to voting for the death or whether they could follow the court's instructions and

weigh any mitigating circumstances. Throughout this line of questioning by Wilcher's attorneys as well as by the court, several jurors responded that they could not consider mitigating circumstances and/or that they would vote automatically for the death penalty. These jurors were excused for cause by the trial court.

¶188. Wilcher contends that one of the jurors, Sarah R. King, impaneled in his resentencing trial was not honest during voir dire. Wilcher asserts that all through the questioning of whether there was any venire person who could not follow the court's instruction and weigh mitigating evidence or would otherwise automatically vote for the death penalty, King remained silent. Wilcher contends that King was less than candid and that, in reality, she was predisposed to voting for the death penalty without following the court's instructions to consider mitigating circumstances.

¶189. To support this contention, Wilcher offers this Court his Exhibit 63, which he purports to be the affidavit of Sarah R. King. However, his Exhibit 63 is an unsworn statement. An affidavit is "[a] written or printed declaration or statement of facts, made voluntarily, *and confirmed by the oath or affirmation of the party making it, taken before a person having authority to administer such oath or affirmation.*" Black's Law Dictionary 58 (6th ed. 1990) (emphasis added). *See also **Wilborn v. State***, 394 So.2d 1355, 1359 (Miss.1981). Wilcher attaches and relies on numerous statements which he refers to as "affidavits." Many of these "affidavits" have not been notarized as made before any official. We refers to those as "unsworn statements." King's statement bares only the signature of a witness. An unsworn statement of a juror is insufficient evidence to support Wilcher's allegation. ***Russell v. State***, 849 So.2d

76

at 119. Miss. Code Ann. §99-39-9(1)(e) requires that Wilcher furnish affidavits to support his claims or show cause as to why he could not furnish them. Wilcher has done neither.

¶190. Further, as the State correctly points out, Rule 606(b) of the Mississippi Rules of Evidence provides:

> (b)     Inquiry Into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental process in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to beat upon any juror. *Nor may his affidavit or evidence of any statement by him concerning a matter about which would be precluded from testifying be received for these purposes.*

(emphasis added).

¶191. Without disregarding the fact that Wilcher's claim is not supported by a sworn affidavit, a discussion of the unsworn statement by Sarah R. King reveals that Wilcher's claim is also without merit.

¶192. This Court has discussed the issue of jurors remaining silent regarding their views during voir dire. The Court held:

> With regard to evidence that juror Jacobs remained silent during voir dire when asked if she had been a victim of a violent crime: ***Odom v. State***, 355 So.2d 1381 (Miss.1978) is our seminal case. ***Odom*** holds that the failure to respond does not warrant this Court granting a defendant/appellant a new trial unless
> > the question propounded to the juror was (1) relevant to the voir dire examination; (2) ... unambiguous; ... (3) ... the juror had substantial knowledge of the information sought to be elicited ... [and (4) ] prejudice ... in selecting the jury could reasonably be inferred from the juror's failure to respond.

355 So.2d at 1383. ***Myers v. State***, 565 So.2d 554, 558 (Miss.1990); ***Chase v. State***, 645 So.2d 829, 847 (Miss.1994).

However, assuming that the first three elements of the [sic] ***Odom*** were met, Lewis has not shown that he was prejudiced by Jacobs' failure to respond during voir dire. Moreover, even if Jacobs had disclosed that she had been raped, Lewis would not necessarily have been entitled to a challenge for cause. ***Lester v. State***, 692 So.2d 755, 791 (Miss.1997) ("courts would be hard- pressed to find people in Hinds County these days who have not at one time or another been victims of crime"). In addition, this case was about murder and robbery, not rape.

***Lewis v. State***, 725 So. 2d 183, 191 (Miss. 1998).

¶193. Like the ***Lewis*** case, if we assume in the instant case that the first three elements of ***Odom*** were met, Wilcher cannot pass the fourth element. Wilcher tries to prove prejudice by showing that King was predisposed to voting for death without weighing mitigating factors. The proof he offers is paragraph 9 of King's unsworn statement. However, in order to put King's unsworn statement into the proper context, one must also look at paragraph 8. The portion of King's unsworn statement that Wilcher omits in his post-conviction application portrays King's views from a more accurate perspective. The pertinent parts of her unsworn statement is as follows:

8. The judge gave us written instructions. He said if we followed them we couldn't make a mistake. It was easy to follow them. We had to weigh aggravating and mitigating factors. I don't think there were any mitigating factors.

9. There really wasn't anything the defense could have put on to make us give a sentence less than death. These were heinous crimes. They tried to blame what Bobby did on his daddy being a logger& alcoholic. Lots of people are abused and they don't do terrible things.

¶194. The statement made by King does not evidence her unwillingness to consider mitigating factors or that she had a predisposition to the death penalty that she did not disclose during voir

78

dire. In fact, her statement illustrates her willingness to follow the written instructions and weigh aggravating and mitigating factors. King's statement demonstrates that she did not find any, or did not give much weight to, mitigating circumstances after hearing all of the testimony. Wilcher's claim is both unsupported and without merit.

¶195. As for the second part of this issue, "Defense Counsel was ineffective for failing to object to the State's unconstitutional argument," Wilcher makes no reference to what argument by the State was unconstitutional. Wilcher presents nothing in the form of an ineffective assistance of counsel argument in this claim. If Wilcher intended to present an ineffective assistance of counsel argument with this claim, he has done so by title alone. Therefore, it cannot be discussed other than to point out that this Court has said that voir dire "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Ballenger v. State*, 667 So.2d 1242, 1250 (Miss. 1995). This Court has directed the trial court to take a substantial role in conducting *Witherspoon* voir dire of potential jurors in capital cases. *Id*.

**F.     WHETHER WILCHER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO BE TRIED BY A FAIR AND IMPARTIAL JURY WERE VIOLATED BY THE JURY'S RELIANCE ON MATTERS NOT PRESENTED IN EVIDENCE.**

¶196. Wilcher asserts that he did not receive a fair trial before an impartial jury. He alleges that a dictionary was sent into the jury room, together with the exhibits properly introduced into evidence. To support this assertion, Wilcher provides an unsworn purported statement of Cynthia Patton, a juror from Wilcher's resentencing trial. Wilcher's Exhibit 63. Patton states:

"During our deliberations we were given boxes of exhibits and documents that had been entered into evidence. I think we were given a dictionary, too."

¶197. First, Wilcher's Exhibit 63, which he purports to be the affidavit of Cynthia K Patton, is an unsworn statement purported to be that of Cynthia K. Patton. An affidavit is "[a] written or printed declaration or statement of facts, made voluntarily, and confirmed by the oath or affirmation of the party making it, taken before a person having authority to administer such oath or affirmation." Black's Law Dictionary, 58 (6th ed. 1990). Patton's statement bears only the signature of a witness. An unsworn statement of a juror is insufficient evidence to support Wilcher's allegation. *Russell v. State*, 849 So.2d at 119. Without waiving the bar that Wilcher's claim is not supported by an affidavit, a discussion of the merits follows.

¶198. In *Collins v. State*, 701 So.2d 791, 794 (Miss. 1997), this Court held "that the trial judge erred when he sent, without proper safeguards or limitations, the entire *Black's Law Dictionary* to the jury room in response to the jury's request for a legal definition. Regrettably, we reverse the conviction of Anthony Collins and remand this cause for a new trial." *Id.* at 793. The jury in *Collins* requested the definition of "premeditation." In its discussion of *Collins*, this Court examined its prior decisions in *Annaratone v. State*, 399 So.2d 825 (Miss. 1981) and *Brister v. State*, 86 Miss. 461, 38 So. 678 (1905).

¶199. In *Brister*, Polly Brister was tried and convicted of permitting gambling in her home. 86 Miss. at 461, 38 So. at 678. A motion for a new trial was made by Brister because one of the jurors found, in the jury room, a copy of the annotated Code of Mississippi, 1892, and proceeded to read the applicable statutes to his associates and argued the case to them. *Id.* at

80

462, 38 So. at 678. This Court, in a short sentence with little explanation, affirmed the denial of the motion for a new trial, stating that the jury's use of the law books was not reason for disturbing the verdict "if it does not appear that any prejudice resulted from the irregularity." *Id*. at 463, 38 So. at 678.

¶200. In *Annaratone*, a rape case, the jury discovered law books stored in the jury room. 399 So.2d at 827. At a hearing following the trial, members of the jury testified that some of the jurors read from one of the books about an automobile accident and from another book regarding the history of the county. Relying upon *Brister*, the judge denied the defendant's motion for a new trial. *Annaratone*, 399 So.2d at 827. This Court affirmed.

¶201. In *Collins* this Court distinguished the facts before it from those in *Annaratone* and *Brister* as follows:

> The issue presented by these two cases is that of extraneous influence upon the jury with respect to law books discovered in the jury room and used in deliberations by the jury. In such cases we require that the party seeking the relief show prejudice. In the case sub judice, the judge injected the extraneous influence into the jury's deliberation, a qualitatively different proposition. Any material sent into the jury room by the judge carries with it the imprimatur of authority and rises almost to the level of a jury instruction.

*Collins*, 701 So.2d at 795. The Court found a problem with the fact that

> [n]o safeguards were taken to keep the jurors from looking into other portions of the dictionary. At the end of the definition of "premeditation," there is a cross-reference to "malice aforethought." The definition of "malice aforethought" in *Black's Law Dictionary* has been held by this Court to be inconsistent with Mississippi law, and this Court has reversed a jury which relied upon the inconsistent definition. *Nicolaou v. State*, 534 So.2d 168, 174-75 (Miss.1988). Clearly, sending to the jury room a law dictionary with a cross-reference to a definition of "malice aforethought" which is contrary to Mississippi law raises not just a possibility, but the probability, that the cross-reference caught the eye of the jury and led them to that incompatible definition.

81

701 So.2d at 796.

¶202. The Court in *Collins* also looked at *Bates v. Preble*, 151 U.S. 149, 14S.Ct. 277, 38 L.Ed.106 (1894). In *Bates,* the trial court allowed the whole of a memorandum book to go into the jury room without sealing or providing other safeguard to prevent the jurors from reading portions of the memorandum book which were not in evidence. *Id.* at 157. The Court suggested that instructions to the jury to not look at the objectionable portions might have been curative had the material in the rest of the memorandum book been unimportant. *Id.* at 158. The Court maintained the objectionable sections of the book were "likely to attract the eye of the jury, and accident or curiosity would be likely to lead them, despite the admonition of the court, to read the plaintiff's comments upon the defendants and her private meditations, which had no proper place in their deliberations." *Id.*

¶203. In *Collins* this Court further recognized that in *Bates*, although nothing indicated that jurors had actually read any of the improper sections of the memorandum, the Court's opinion was written with a tone of probability, i.e., "the objectionable portions would be 'likely to lead' the jury to information not properly admitted as evidence." *Collins*, 701 So.2d at 796 (quoting *Bates*, 151 U.S. at 158). This Court found the trial court's action improper and reversible error. *Id.*

¶204. This Court in *Collins* concluded:

> [t]he key distinction between the reasoning yielding the rule in *Bates* and *Yanes* and the reasoning giving rise to the rule in *Annaratone* and *Brister* is that the extraneous influence was injected into the jury deliberations by the court and not by accident, as in *Annaratone* and *Brister*, or by some outside party. Because the extraneous influence was introduced into the jury's deliberations by the court and not by accident or some outside party, we hold that a

82

presumption is raised that prejudice flows from the injection of such an extraneous influence. *See **Bates***, 151 U.S. at 158, 14 S.Ct. at 279; ***Holmes***, 522 P.2d at 905. The action of a trial judge in giving instructions to a jury or sending evidence to a jury for consideration is substantially and qualitatively distinct from the jury's improper use of law books discovered in the jury room or an extraneous influence injected by an outside party and requires a more stringent standard.

***Collins***, 701 So.2d at 796.

¶205. There are several notable distinctions between this Court's decision in ***Collins*** and the case sub judice. First, there is nothing in the record to support a conclusion that the dictionary was injected into jury deliberation by the court. *See **Collins***, 701 So.2d at 796. At best, the unsworn purported statement of Cynthia Patton is uncertain in that she states that she thinks they were given a dictionary. Nothing indicates that the jury did, in fact, receive a dictionary.

¶206. Second, this Court finds that there is a difference between a standard dictionary and a law dictionary in that a standard dictionary is less likely to improperly instruct a jury on the laws of the State of Mississippi.

¶207. Further, nothing from the record indicates that a dictionary was given to the jury and nothing in Patton's statement indicates by whom a dictionary was given. We find that Wilcher has not made a showing that an "extraneous influence was injected into the jury deliberations by the court." The case subjudice differs from ***Collins***, in that the record clearly established that the trial judge was injecting the *Black's Law Dictionary* into jury deliberations and an objection was made on the record by defense counsel. ***Collins***, 701 So.2d at 796.

¶208. In ***Annaratone***, the Court stated as follows:

But even if this were not the law, the verdict must be sustained against the assault upon it on another and higher ground. The only evidence in impeachment of the verdict was the testimony of one of the jurors. It is not competent thus to

impeach a verdict. 'Such evidence is forbidden by public policy, since it would disclose the secrets of the jury room, and afford opportunity for fraud and perjury. It would open such a door for tampering with weak and indiscreet men that it would render all verdicts insecure; and, therefore, the law has wisely guarded against all such testimony, and has considered it as unworthy of notice. It would be a most pernicious practice, and in its consequences dangerous to this much-valued mode of trial, to permit a verdict, openly and solemnly declared in court, to be subverted by going behind it and inquiring into the secrets of the jury room.' 14 Ency. Pl. & Pr., 906-909. The testimony should not have been heard. Having been heard, it should have been disregarded, as doubtless it was. ([*Brister*]86 Miss. at 463, 464; 38 So. at 678, 679).

*Annaratone*, 399 So.2d at 827. Jurors generally may not impeach their own verdict by testifying about motives or influences affecting deliberations; however, jurors may testify about misconduct in their presence or about outside influences on the jury panel. M.R.E. 606(b).

¶209. This Court finds that this claim is both unsupported by an affidavit and without merit.

### G. WHETHER THE PROSECUTION'S USE OF SENTENCING INSTRUCTIONS S-1, S-2, AND S-4 WAS UNCONSTITUTIONAL AND DEFENSE COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE THIS AT TRIAL AND ON DIRECT APPEAL.

¶210. Wilcher asserts that the sentencing instructions submitted by the state conjunctively "instructed the jury that the death penalty was demanded because Wilcher had already been convicted of capital murder which was done while engaged in the commission of or an attempt to commit the crime of robbery or kidnaping."

¶211. The following are the pertinent parts of the instructions at issue that were submitted to the jury:

*Sentencing Instruction S-1B(part B)*

Next, to return the death penalty, you must find that the mitigating circumstances- those which tend to warrant the less severe penalty of life

84

imprisonment - do not outweigh the aggravating circumstances - those which tend to warrant the death penalty. Consider only the following elements of aggravation in determining whether the death penalty should be imposed:

(1)     whether the Defendant was previously convicted of a felony involving the use or threat of violence to the person;

(2)     whether the capital offense was committed while the Defendant was engaged in the commission of robbery;

(3)     whether the capital offense was committed while the Defendant was engaged in the commission of or an attempt to commit the crime of kidnaping.

*Sentencing Instruction S-2*

The Court instructs the Jury that at this hearing, the State may elect to stand on the case made at the guilt hearing and you may consider the evidence presented during the guilt phase of this trial together with the evidence presented at the sentencing phase in deciding whether the defendant shall be sentenced to death, life imprisonment without parole of life imprisonment.

*Sentencing Instruction S-3*

The Court instructs the jury that the killing of a human being without authority of law, is Capital murder when done by any person while engaged in the commission of or an attempt to commit either the crime of robbery or of kidnaping. These are the statutory elements of the Capital offense of which Bobby Glen Wilcher is charged. Proof beyond a reasonable doubt of the statutory elements of the Capital offense with which the accused is charged shall constitute sufficient circumstances to authorize imposition of the penalty of death unless the mitigating circumstances shown by the evidence outweighed the aggravating circumstances. You shall not be required to make a special finding of any mitigating circumstances in order to return a verdict that the accused should be sentenced to life in prison without parole, or to life in prison. However, before you may return a verdict that the Defendant, Booby Glen Wilcher, should suffer the penalty of death, you must unanimously find in writing that after weighing the mitigating circumstances and the aggravating circumstances one against the other that the mitigating circumstances do not outweigh the aggravating circumstances and that the Defendant should suffer the penalty of death.

*Sentencing Instruction S-4*

> The Court instructs the Jury that another jury has already found the Defendant, Booby Glen Wilcher, guilty of the Capital murder of Katie Belle Moore beyond a reasonable doubt. In your deliberations concerning whether the defendant should receive the death penalty, life in prison without parole or life in prison you should accept as fact that the Defendant is guilty of the capital murder of Katie Belle Moore.

¶212. Wilcher argues that the use of these sentencing instructions "obstructed the jury's ability to determine whether aggravating factors existed to impose the death penalty was an unconstitutional invasion of the right to be tried by jury." Wilcher further argues that his counsel was ineffective for failing to preserve or raise this issue on appeal. *Id.*

¶213. Wilcher relies on *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (Arizona statute pursuant to which, following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determines the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty, violates the Sixth Amendment right to a jury trial in capital prosecutions), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The United States Supreme Court discussed *Apprendi* in support of its decision in *Ring* and held that "[c]apital defendants, no less than non-capital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589. We find that Wilcher's criminal proceedings are not inconsistent with *Apprendi* and *Ring* because here it was a jury, not a judge, that determined beyond a reasonable doubt the existence of aggravating factors surrounding Wilcher's capital crimes. This was done during the guilt phase of Wilcher's trial.

¶214. It appears that Wilcher is under the impression that he had a right to relitigate his guilt of the underlying capital murder in front of the jury during his resentencing. This Court has held that the guilt of a capital murder is res judicata during the sentencing phase and may not be relitigated. *Holland v. State*, 705 So.2d at 322-23.

> In that the conviction by the first jury was not disturbed on appeal, the present sentencing jury was prohibited by the doctrine of *res judicata* from relitigating the issue of guilty (sic). Rather, the second jury's function was to accept the first jury's finding that Irving was guilty of felony-murder involving robbery and then to determine sentence.

*Id.* (citing *Irving v. State*, 441 So.2d 846, 851-52 (Miss. 1983)). During the guilt phase of Wilcher's trial, a jury found beyond a reasonable doubt the existence of aggravating circumstances. The jury impaneled for Wilcher's resentencing was charged with weighing those aggravating circumstance against any mitigating circumstances. Wilcher's argument is without merit. Wilcher's criminal proceeding is not inconsistent with *Apprendi* and *Ring*. The prosecution's use of these instructions was not unconstitutional.

¶215. As for Wilcher's ineffective assistance of counsel claim, the use of these jury instructions was permissible, and any objection to them made by defense counsel would likely have been overruled. Therefore, Wilcher's attorneys cannot be considered deficient for failing to argue that the use of the instructions was unconstitutional. The ineffective assistance of counsel claim does not pass *Strickland*.

> **H.    WHETHER WILCHER'S FIFTH, EIGHTH AND/OR FOURTEENTH AMENDMENT RIGHTS HAVE BEEN VIOLATED BY THE LENGTH OF TIME ON MISSISSIPPI'S DEATH ROW AND THE MANY EXECUTION DATES THAT HAVE BEEN SET.**

¶216. Wilcher asserts that he has been subjected to "cruel and inhuman" treatment because he has been kept in maximum confinement on Mississippi's Death Row under conditions including lock-down and isolation for at least 23 hours out of the day, and because he has been subjected to numerous execution dates during those 19-20 years. To support this argument, Wilcher relies on dissenting opinions in *Elledge v. Florida*, 525 U.S. 944, 119 S.Ct. 366, 142 L.Ed.2d 303 (1998) (Breyer, J., dissenting from denial of certiorari) and *Lackey v. Texas*, 514 U.S. 1045, 1045-47, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995) (opinion of Stevens, J., respecting denial of certiorari).

¶217. This Court has spoken to this very issue before:

> Jordan argues that he has been incarcerated on death row from the time the crime was committed in this case, in 1976, until 1991, and then again in 1998, when the life sentence was vacated, until now. He claims that he has suffered psychological trauma waiting for his execution and that there is nothing gained by the State from 22 years of needless infliction of pain and suffering. He indicates that the United States Supreme Court has held that the death penalty violates the Eighth Amendment when it makes no measurable contribution to acceptable goals of punishment, i.e., retribution and deterrence, and is nothing more than needless imposition of pain and suffering. *Penry v. Lynaugh*, 492 U.S. 302, 335, 109 S.Ct. 2934, 2956, 106 L.Ed.2d 256, 289 (1989).
>
> * * *
>
> There is no precedent which supports Jordan's contention that his Eighth Amendment right against cruel and unusual punishment has been violated. Therefore, there are no grounds for reversal on this issue.

*Jordan*, 786 So.2d at 1028. This Court's language in *Jordan* goes to the very heart of the issue presented by Wilcher. There is no law of the United States or of this State to support Wilcher's claim. There are no grounds for post-conviction relief on this issue. *Jordan*, 786 So.2d at 1028.

   **I.     WHETHER THE ACCUMULATION OF ERROR IN THIS CASE REQUIRES THAT THE DEATH SENTENCE BE SET ASIDE.**

¶218. Wilcher argues that cumulative errors committed at trial denied him a fair trial. A criminal defendant is not entitled to a perfect trial, only a fair trial. *McGilberry v. State*, 843 So.2d 21, 33 (Miss. 2003) (citing *Sand v. State*, 467 So.2d 907, 911 (Miss.1985)). Wilcher cannot support a contention that he has not received a fair trial.

¶219. This Court may reverse a conviction and/or sentence based upon the cumulative effect of errors that do not independently require a reversal. *Jenkins v. State*, 607 So.2d 1171, 1183-84 (Miss. 1992); *Hansen v. State*, 592 So.2d 114, 153 (Miss. 1991). "It is true that in capital cases, although no error, standing alone, requires reversal, the aggregate effect of various errors may create an atmosphere of bias, passion and prejudice that they effectively deny the defendant a fundamentally fair trial." *Conner v. State*, 632 So.2d 1239, 1278 (Miss. 1993) (citing *Woodward v. State*, 533 So.2d 418, 432 (Miss. 1988)). A review of the record, the briefs, and the arguments shows that there were no individual errors which required reversal and that there is no aggregate collection of minor errors that would, as a whole, mandate a reversal of either the conviction or sentence. This issue itself is therefore without merit.

## CONCLUSION

¶220. For these reasons, we deny all of Wilcher's applications for leave to seek post-conviction relief.

¶221. **APPLICATIONS FOR LEAVE TO SEEK POST CONVICTION RELIEF, DENIED.**

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., WALLER, COBB AND CARLSON, JJ., CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**